# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JONATHAN A. WATSON**
Wandling & Associates
South Bend, Indiana

ATTORNEY FOR APPELLEE:

**MICHAEL S. BERGERSON**
Law Offices of Michael S. Bergerson
Michigan City, Indiana

FILED

Apr 15 2013, 8:24 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SERENITY SPRINGS, et al, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| vs. | ) | No. 46A03-1205-MI-214 |
| | ) | |
| THE LAPORTE COUNTY CONVENTION AND | ) | |
| VISITORS BUREAU, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE LA PORTE SUPERIOR COURT
The Honorable William J. Boklund, Judge
Cause No. 46D04-1101-MI-1

**April 15, 2013**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

Serenity Springs, Inc. and its principal owner, Laura Ostergren, (collectively, Serenity) appeal from the trial court's order permanently enjoining Serenity from using the designation "Visit Michigan City LaPorte"[1] and ordering Serenity to transfer the domain name registration for visitmichigancitylaporte.com to the LaPorte County Convention and Visitors Bureau (the Bureau). Serenity raises three issues, which we consolidate and restate as follows: Did the trial court err in concluding that Serenity committed trademark infringement and cybersquatting? The Bureau cross-appeals and requests an award of appellate attorney fees. Concluding that the Bureau did not establish that Serenity committed trademark infringement or cybersquatting because it failed to establish that it held a valid and protectable trademark in the designation "Visit Michigan City LaPorte," we reverse the trial court's judgment and remand with instructions to consider the Bureau's remaining claims. Additionally, because Serenity has prevailed in this appeal, we deny the Bureau's request for appellate attorney fees.

The Bureau is a special-purpose governmental unit governed by Ind. Code Ann. § 6-9-6 (West, Westlaw current through 2012 2nd Reg. Sess.). Its mission statement provides that it is "the official destination marketing organization that represents the visitor industry and communities to create economic growth from visitor expenditures." *Appellee's Appendix* at 6. The Bureau's goal is to increase tourism in LaPorte County, and in doing so, the Bureau

---

[1] Throughout the record, this designation is referred to with slight variations, including "Visit Michigan City LaPorte," "VISITMICHIGANCITYLAPORTE," and "visitmichigancitylaporte." For purposes of clarity, we will refer to the designation as "Visit Michigan City LaPorte," except when we refer specifically to a domain name.

2

promotes a number of hotels and attractions in the area. Serenity operates a hotel resort in LaPorte County, which is one of the businesses promoted by the Bureau.

In early 2009, the Bureau contracted with a private marketing firm to conduct a branding study for the purposes of identifying new and better ways to promote tourism in the area. On September 9, 2009, the Bureau held a public meeting at which the results of the branding study were announced, and a representative of Serenity was in attendance. The Bureau's representatives announced that the phrase "Visit Michigan City LaPorte" had been identified as the branding identifier for the area.

Immediately after the meeting, an employee of Serenity registered the domain name "visitmichigancitylaporte.com" at Ostergren's behest and set it up to redirect internet traffic to Serenity's website. Later that day, an employee of the Bureau attempted to register the same domain name, but discovered that it had already been purchased and was being used to direct internet traffic to Serenity's website. The Bureau was able to register a number of similar domain names, including visitmichigancitylaporte.org, visitmichigancitylaporte.net, and michigancitylaporte.com.

Thereafter, the Bureau sent a cease-and-desist letter to Serenity claiming that Serenity had infringed its trademark and committed cybersquatting by registering visitmichigancitylaporte.com. Serenity responded that it had been unable to find any federal or state trademark registrations for Visit Michigan City LaPorte and further claimed that (1) Serenity had not committed trademark infringement because it registered and began using the visitmichigancitylaporte.com domain name before the Bureau made any commercial use of

3

the designation Visit Michigan City LaPorte, and (2) that the designation was not protectable as a trademark because it was merely descriptive and had not acquired distinctiveness. *Appellee's Appendix* at 53-54.

On April 29, 2010, the Bureau filed an application with the Secretary of State to register "'Visit Michigan City LaPorte' and logo" as a trademark under the Indiana Trademark Act. *Appellant's Appendix* at 17. In its application, the Bureau indicated that the mark was first used in commerce on September 9, 2009, and disclaimed any rights to the words "Michigan City" or "LaPorte." *Id.* The Bureau received a certificate dated May 13, 2010 indicating that "Visit Michigan City LaPorte" had been registered as a trademark with the Secretary of State. *Id.* at 16. The certificate also indicated that the mark was first used on September 9, 2009, and the words "Michigan City LaPorte" had been disclaimed. *Id.*

On May 26, 2011, the Bureau sent another cease-and-desist letter to Serenity, again asserting that Serenity was infringing its rights in the now-registered trademark. The Bureau attached a copy of the certificate of trademark registration to the letter and informed Serenity that the letter would be its final attempt to resolve the matter before taking legal action.

Serenity sent a response letter to the Bureau on June 1, 2010. In the letter, Serenity again asserted that it was the first party to use the mark in commerce, and argued further that the Bureau's registration of the mark did not affect Serenity's common-law rights to use the mark or confer retroactive trademark rights. Serenity stated that it was willing to assign the domain name to the Bureau if it could provide proof that it first used the mark in commerce on or before September 9, 2009. Serenity argued that if the Bureau had not used the mark in

4

commerce by that date, it had fraudulently misrepresented the date of first use on the application for trademark registration, which would result in cancellation of the registration.

On January 4, 2011, the Bureau filed a complaint against Serenity alleging trademark infringement, cybersquatting, and unfair competition.[2] The Bureau also sought and obtained a preliminary injunction prohibiting Serenity from using the domain name. The matter proceeded to a bench trial on March 8, 2012, and the trial court entered judgment in favor of the Bureau on May 1, 2012. The trial court concluded that Serenity had violated Indiana law by committing trademark infringement and "cybersquatting that approaches cyberpiracy[.]" *Appellant's Appendix* at 13. The trial court permanently enjoined Serenity from using the Visit Michigan City LaPorte designation or the domain name visitmichigancitylaporte.com, and further ordered Serenity to transfer the domain name registration to the Bureau. This appeal ensued.

1.

Serenity appeals from a judgment entered following a bench trial. In reviewing claims tried by the bench without a jury, our court shall not set aside the judgment "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). "In determining whether a judgment is clearly erroneous, we will not reweigh the evidence or determine the credibility of witnesses but will consider only the evidence that supports the judgment and the reasonable inferences

---

[2] The parties have not provided us with a copy of the Bureau's complaint. We are able to discern the basis of the complaint, however, from the copy of Serenity's answer, which was included in the *Appellee's Appendix*.

to be drawn from that evidence." *Bennett v. Broderick*, 858 N.E.2d 1044 (Ind. Ct. App. 2006), *trans. denied*.

We define the clearly erroneous standard based upon whether the party is appealing a negative or an adverse judgment. *Garling v. Ind. Dep't of Natural Res.,* 766 N.E.2d 409 (Ind. Ct. App. 2002), *trans denied.* "A negative judgment is one entered against a party who bears the burden of proof, while an adverse judgment is one entered against a party defending on a given question." *Id.* at 411. In the instant case, the trial court entered judgment in favor of the Bureau, the party bearing the burden of proof at trial. Accordingly, Serenity is appealing an adverse judgment. Under these circumstances, we hold the trial court's findings clearly erroneous if they are not supported by substantial evidence of probative value. *Garling v. Ind. Dep't of Natural Res.,* 766 N.E.2d 409. Moreover, "[e]ven if the supporting evidence is substantial, we will reverse the judgment if we are left with a definite and firm conviction a mistake has been made." *Id.* at 411.

Serenity argues that the trial court erred in concluding that it had committed trademark infringement and cybersquatting because (1) the Visit Michigan City LaPorte designation is geographically descriptive and not subject to trademark protection, and (2) alternatively, if the designation is protectable, Serenity Springs acquired superior rights to the mark because it was the first to use it in commerce. As an initial matter, we note that the trial court concluded that the law of trademarks did not apply to the Bureau with the same force as a private entity due to the transparency requirements imposed upon governmental units. Specifically, the court concluded

6

34. That the construction of trademark law suggested by [Serenity] does not take into account demands of transparency placed on governmental entities concerning how they do business, and to construe the law so as to require government to do business just as private concerns do business would violate those laws that demand openness in government.

35. The demand for openness in government required [the Bureau] to reveal matters that in private business would not have been revealed publicly, thereby jeopardizing [the Bureau's] ability to protect its mark and its investment in money.

36. The construction of trademark law suggested by [Serenity] would require that [the Bureau] do business in a manner similar to a private entity, without regard to the requirements placed on governmental units by Indiana law, including the Open Door Law. Conducting business in such a manner makes it impossible for a governmental entity to protect its investment of tax money in projects such as this one.

*Appellant's Appendix* at 11.

Serenity argues that "adopting the trial court's reasoning would, in effect, create an exception to a statutory rule of law that would apply in nearly every situation where a public entity and private entity were in competition." *Appellant's Brief* at 17. We agree. This court has long held that the exclusive right to use a mark is acquired through adoption *and use* of the mark in commerce. *See Johnson v. Glassley*, 118 Ind. App. 704, 83 N.E.2d 488 (1949) ("[t]he mere adoption of a particular name as a trade name, without actual use thereof in the market, confers no right thereto, even though such adoption is publicly declared" ); *Hartzler v. Goshen Churn Ladder Co.*, 55 Ind. App. 455, 104 N.E. 34 (1914). We are unaware of any authority suggesting that governmental units need not comply with the use requirement in order to acquire exclusive rights to use a particular mark. To the extent the trial court concluded that governmental entities competing with private entities are entitled to extra protection or relieved of the burden of establishing the elements of trademark infringement

7

claims, such conclusion was error.

Before turning to the merits of Serenity's argument concerning the validity of the Bureau's claimed trademark, a brief review of the law of trademarks is in order. Trademark law is a subspecies of the law of unfair competition. 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2.7 ("A basic aspect of the United States economy is that of the market place policed by laws that set a minimum level of fair competition. The law of trademarks is but a branch of this broader area called the law of 'Unfair Competition or 'Unfair Trade Practices.'" (footnote omitted)); 20 Ind. Law Encyc. Monopolies and Unfair Trade § 8 (noting that "trademark infringement is one type of unfair competition." (footnote omitted)).

> The goal of trademark protection is to allow a firm to affix an identifying mark to its product (or service) offering that will, because it is distinctive and no competitor may use a confusingly similar designation, enable the consumer to discover in the least possible amount of time and with the least possible amount of head-scratching whether a particular brand is that firm's brand or a competitor's brand.

*Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604 (7th Cir. 1986); *see also Carroll v. Lordy*, 431 N.E.2d 118, 123 (Ind. Ct. App. 1982) ("[t]he purpose of a trademark is to identify the source of the product, not the product itself").

Trademark law is rooted in English common law, and was "largely codified" at the federal level in the Trademark Act of 1946, commonly known as the Lanham Act. *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003). The Lanham Act defines a trademark, in relevant part, as "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from

those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C.A. § 1127 (West). A "service mark" is the same as a trademark, except that it relates to services as opposed to goods or products. *Id.* The Lanham Act provides the holder of a mark with a cause of action against infringers. 15 U.S.C.A. § 1125 (a) (West). The plaintiff must prove two elements in order prevail on a claim of trademark infringement under the Lanham Act: (1) that he or she has a protectable ownership interest in the mark, and (2) that the defendant's use of the mark is likely to cause consumer confusion. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225 (5th Cir. 2010); *see also Tana v. Dantanna's*, 611 F.3d 767 (11th Cir. 2010).

In 1999, Congress passed the Anti-Cybersquatting Consumer Protection Act (ACPA) as an amendment to the Lanham Act for the purpose of prohibiting "cybersquatting." *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004).

> '[C]ybersquatting' occurs when a person other than the trademark holder registers the domain name of a well[-]known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder. A trademark owner asserting a claim under the ACPA must establish the following: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit.

*Id.* (citations omitted); *see also Felsher v. Univ. of Evansville*, 755 N.E.2d 589 (Ind. 2001) (discussing Lanham Act claims against cybersquatters and cyber copycats). Thus, in order to prevail on either a trademark infringement or cybersquatting claim under the Lanham Act,

9

the plaintiff must first prove that he or she has a valid and protectable mark.[3]

To receive protection under the Lanham Act as a trademark or service mark, a designation must be "distinctive." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11.2 ("'Distinctive' has a special meaning in trademark law. . . . Without achieving distinctiveness . . . a designation does not have the legal status of a 'trademark' or 'service mark.' No distinctiveness—no mark." (footnote omitted)). As the U.S. Supreme Court has explained, marks are classified into the following categories of increasing distinctiveness: marks that are (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2nd Cir. 1976)).

The latter three categories of marks—those that are suggestive, arbitrary, or fanciful—are considered inherently distinctive and entitled to trademark protection "because their intrinsic nature serves to identify a particular source of a product[.]" *Id.* at 768. "Fanciful marks are, in essence, made-up words expressly coined for serving as a trademark. Some examples of fanciful marks are Clorox®, Kodak®, Polaroid®, and Exxon®." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996). Arbitrary marks consist of

---

[3] In its order, the trial court concluded that Serenity had committed "cybersquatting that approaches cyberpiracy, in violation of [Indiana] common law." *Appellant's Appendix* at 13. In support of this conclusion, however, the court cited the ACPA and *Felsher v. Univ. of Evansville*, which discussed cybersquatting as a potential violation of the Lanham Act. 755 N.E.2d 589 (Ind. 2001). In other words, the authorities relied upon by the trial court support a cause of action for cybersquatting under federal statutory law only. The parties have not directed our attention to, and we are unaware of, any authority suggesting the existence of an Indiana statutory or common-law cause of action for cybersquatting *per se*. Of course, this does not preclude the possibility that acts amounting to cybersquatting under the Lanham Act and ACPA might also be actionable under the Indiana Trademark Act or common-law unfair competition principles.

words or symbols that are in common usage, but are arbitrarily applied to the goods or services "because they do not suggest or describe any quality, ingredient, or characteristic of the goods they serve . . . . Examples include Tea Rose® flour, Camel® cigarettes, and Apple® computers." *Id.* "Suggestive marks connote, without describing, some quality, ingredient, or characteristic of the product. Coppertone®, Orange Crush®, and Playboy® are good examples of suggestive marks because they conjure images of the associated products." *Id.*

Descriptive marks and generic marks, on the other hand, are not inherently distinctive. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763. Generic designations refer merely "to the genus of which the particular product is a species," and are never protectable as trademarks because they do not indicate the particular source of an item. *Id.* at 768; *see also Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 976 (10th Cir. 2002) (identifying the word "cola" as an example of a generic designation). Descriptive marks describe "'the ingredients, qualities, or characteristics of an article of trade or a service[.]'" *Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998). As a general matter, descriptive marks are not protectable as trademarks, "'both because they are poor means of distinguishing one source of services from another and because they are often necessary to the description of all goods or services of a similar nature.'" *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153 (7th Cir. 1996) (quoting *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986)). Descriptive marks will become protectable, however, "where the holder can establish that the mark has acquired 'secondary meaning' in the

11

collective consciousness of the relevant community." *Id.* (quoting *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 907 (7th Cir. 1983)). Secondary meaning exists when consumers regard the designation not as a description, but as the name of the product or service itself. *Packman v. Chicago Tribune Co.*, 267 F.3d 628 (7th Cir. 2001). Geographically descriptive designations generally fall within the descriptive category; thus, to be protected, they must have acquired secondary meaning. 2 McCarthy §§ 14:1 ("'[i]f a geographic term is used merely to indicate the location or origin of the goods and services, it is purely descriptive"). A mark's proper placement on the spectrum of distinctiveness is a question of fact. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351 (11th Cir. 2007).

Under the Lanham Act, the holder of a mark may request the United States Patent and Trademark Office (USPTO) to register the mark on the principal register. 15 U.S.C.A. § 1051, *et seq*. Marks that are "primarily descriptive" and "primarily geographically descriptive" of the goods or services with which they are associated are not eligible for registration on the principal register unless they have "become distinctive of the applicant's goods in commerce." 15 U.S.C.A. § 1052(e), (f) (West). Thus, registration of a descriptive mark on the principal register requires a showing of secondary meaning. *Kohler Co. v. Moen Inc.*, 12 F.3d 632 (7th Cir. 1993). Although the Lanham Act protects both registered and unregistered marks, registration is desirable because it constitutes prima facie evidence of the mark's validity. *See* 15 U.S.C.A. §§ 1057(b), 1115(a). Thus, federal registration of a mark "'entitles the plaintiff to a presumption that its registered trademark is not merely descriptive or generic, or, if merely descriptive, is accorded secondary meaning.'" *Thomas & Betts*

12

*Corp. v. Panduit Corp.*, 138 F.3d 277, 301 (7th Cir. 1998) (quoting *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d at 936). The plaintiff bears the burden of establishing that an unregistered mark is entitled to protection. *Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722.

The Indiana Trademark Act is similar, and in some respects identical, to the Lanham Act. Although Indiana's body of trademark law is relatively undeveloped, the General Assembly has specified that the Indiana Trademark Act "is intended to provide a system of state trademark registration and protection that is consistent with the federal system of trademark registration and protection under the Trademark Act of 1946." Ind. Code Ann. § 24-2-1-0.5 (West, Westlaw current through 2012 2nd Reg. Sess.). Moreover, "[a] judicial or an administrative interpretation of a provision of the federal Trademark Act may be considered as persuasive authority in construing a provision of" the Indiana Trademark Act. *Id.*

The Indiana Trademark Act's definitions of "trademark" and "service mark" track the Lanham Act's definitions of those terms nearly verbatim. *See* I.C. § 24-2-1-2(8), (9) (West, Westlaw current through 2012 2nd Reg. Sess.). Like the Lanham Act, the Indiana Trademark Act does not adversely affect common-law trademark rights. *See* I.C. § 24-2-1-15 (West, Westlaw current though 2012 2nd Reg. Sess.). Registration of a trademark or service mark with the office of the Secretary of State provides a registrant with a remedy for the infringement thereof under the Indiana Trademark Act. I.C. § 24-2-1-14(a) (West, Westlaw current though 2012 2nd Reg. Sess.); *Felsher v. Univ. of Evansville*, 755 N.E.2d 589. Like

13

the Lanham Act, the Indiana Trademark Act prohibits the registration of marks that are "primarily geographically descriptive or deceptively geographically misdescriptive of the goods or services[.]" I.C. § 24-2-1-3 (West, Westlaw current through 2012 2nd Reg. Sess.). This provision does not, however, "prevent the registration of a mark that is used in Indiana by the applicant and has become distinctive of the applicant's goods or services." *Id.* In other words, a geographically descriptive mark may be registered under the Indiana Trademark Act if it has acquired secondary meaning.[4] *See* Restatement (Third) of Unfair Competition § 14 (1995) (providing that a designation that is likely to be perceived by purchasers as merely descriptive of the geographical origin or location of the goods or services with which it is associated is not distinctive and protectable unless it has acquired secondary meaning); *cf. Keaton and Keaton v. Keaton*, 842 N.E.2d 816, 821 (Ind. 2006) ("Personal names, including surnames, are not 'inherently distinctive' and are only protectable as trademarks or trade names upon proof of secondary meaning.").

Serenity argues that the designation at issue in this case, Visit Michigan City LaPorte, is primarily geographically descriptive and not subject to protection as a trademark.[5] The trial court did not specify in its findings where the designation fell on the spectrum of

---

[4] Proof of continuous use of the mark in Indiana for the five years preceding the date the claim of distinctiveness is made may constitute sufficient proof that a geographically descriptive mark has attained secondary meaning. I.C. § 24-2-1-3. The mark at issue in this case clearly has not satisfied this threshold. This does not, however, preclude its registration if there is evidence that the mark has actually achieved secondary meaning within a shorter timeframe.

[5] Serenity also argues that to the extent the designation is protectable as a trademark, it has superior rights to the mark because it was the first to use the mark in commerce. *See Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427 (7th Cir. 1999) ("The party who first appropriates the mark through use . . . acquires superior rights to it."). Because we resolve this matter based on the threshold issue of whether the mark is subject to trademark protection in the first instance, we need not address this argument.

trademark distinctiveness; rather, the court found that the Bureau's "trademarks were distinctive at the time [Serenity] began using the mark and acquired the registration for the domain name VISITMICHIGANCITYLAPORTE.COM." *Appellant's Appendix* at 11. The court also concluded that "[t]he mark was properly certified for trademark." *Id.*

We first note that the designation in question is a geographic composite mark, that is, "one composed of geographic matter coupled with additional matter (e.g. wording and/or a design element)." U.S. Patent and Trademark Office, Trademark Manual of Examining Procedure § 1210.02(c) (hereinafter TMEP), *available at* http://www.uspto.gov/trademarks/resources/TMEP_archives.jsp. Such marks are classified based on their primary significance. *Id.*; *see also* I.C. § 24-2-1-3 (providing that marks that are "*primarily* geographically descriptive" are not registerable unless they have acquired distinctiveness (emphasis supplied)). The mark here consists of two geographic descriptors, "Michigan City" and "LaPorte," preceded by the word "Visit," which, in the context of the tourism industry, is at best descriptive. We have little difficulty accepting Serenity's argument that the designation is primarily geographically descriptive of the goods and services with which it has been associated. *See* TMEP § 1210(c)(ii) ("[g]enerally, the addition of a highly descriptive or generic term to the name of a geographic place does not alter its primarily geographic significance"). Indeed, the purpose of the Bureau's branding efforts is to promote tourism in LaPorte County, and the only unifying characteristic shared by all of the accommodations and attractions promoted by the Bureau is their geographic location. It is difficult to conceive of a mark that falls more squarely within the category of

15

geographically descriptive marks. Because we can conclude as a matter of law that prospective purchasers are likely to understand the designation as describing the geographic location of the goods and services the Bureau promotes, we conclude that the mark is geographically descriptive. Accordingly, the mark must have acquired secondary meaning in order to be protectable.[6]

The Bureau seems to suggest that its registration of the mark with the Secretary of State is sufficient proof of distinctiveness and/or secondary meaning. We cannot agree that registration is a substitute for evidence of the mark's validity. The Indiana Trademark Act provides that the Secretary of State shall cancel a trademark registration for a variety of reasons, including when "a court of competent jurisdiction finds that . . . the registration was granted improperly[.]" I.C. § 24-2-1-10 (West, Westlaw current through 2012 2nd Reg. Sess.). Thus, the Act specifically contemplates that a court may review and overturn the Secretary of State's determination that a particular mark is registerable. Moreover, I.C. § 24-2-1-5 provides that a certificate of registration issued by the Secretary of State "is admissible in evidence as competent and sufficient proof *of the registration of the mark* in an action or judicial proceeding in a court of Indiana." (emphasis supplied). Thus, a certificate of registration is proof of registration only, which is a necessary prerequisite to a suit for infringement under the Indiana Trademark Act. I.C. § 24-2-1-14(a); *Felsher v. Univ. of*

---

[6] The Bureau suggests that its disclaimer of the terms "Michigan City" and "LaPorte" removes the composite designation Visit Michigan City LaPorte from the category of geographically descriptive marks. We disagree. The fact that the Bureau has disclaimed any exclusive right to use these geographic descriptors outside the composite mark at issue in this appeal does nothing to alter our conclusion that the composite mark is itself primarily geographically descriptive.

*Evansville*, 755 N.E.2d 589. The Indiana Trademark Act contains no provisions corresponding to 15 U.S.C.A. §§ 1057(b) and 1115(a), which provide that federal registration of a mark constitutes prima facie evidence of its validity.

Although the Indiana Trademark Act was intended to provide a system of state trademark protection consistent with the Lanham Act, where, as here, the language of the state legislation departs significantly from its federal counterpart, it is apparent that the General Assembly intended a different result. We therefore conclude that the Bureau's registration of the mark with the Secretary of State under the Indiana Trademark Act is not sufficient to establish its validity under the Indiana Trademark Act.[7] Accordingly, to support its infringement claims, the Bureau was required to present evidence to establish the validity of the mark, including the existence of secondary meaning. *See Keaton and Keaton v. Keaton*, 842 N.E.2d at 821 ("[i]n order to state a cognizable claim for trade name infringement, a plaintiff must make a threshold showing of a protectable trade name").[8]

---

[7] To the extent the Bureau asserts a federal trademark claim, we note that there is no evidence that the mark was registered on the USPTO's principal register. Accordingly, the Bureau is not entitled to a presumption of validity under the Lanham Act.

[8] The Bureau seems to suggest that in order to present the argument that the mark is not subject to protection as a trademark, Serenity was required to file as a counterclaim an action to cancel the mark's registration pursuant to I.C. § 24-2-1-14.5 (West, Westlaw current through 2012 2nd Reg. Sess.). Although I.C. § 24-2-1-14.5 provides for a cause of action to cancel a mark registered under the Indiana Trademark Act, we can see no basis for the conclusion that Serenity was required to do so in this case. Serenity has not sought cancellation of the Bureau's trademark. Rather, it has sought to defend against the Bureau's claims of infringement by arguing that the Bureau has not established an essential element of its claims, i.e., the existence of a protectable trademark.

17

Having concluded that the mark is geographically descriptive and not entitled to a presumption of validity, we turn our attention to whether the mark was nevertheless protectable, i.e., whether it had acquired secondary meaning. "The existence of secondary meaning is a question of fact, with the burden of proof on the person claiming rights in the name." *Id.*; *see also* 2 McCarthy § 15:29. The rule applied by the majority of courts, and which we adopt here, is that "the senior user must prove the existence of secondary meaning in its mark just prior to the time and place that the junior user first began use of the mark." 2 McCarthy §§ 15:4, 16:34.

The trial court found that subsequent to the Bureau's registration of the mark with the Office of Secretary of State, "the trademark VISITMICHIGANCITYLAPORTE has come to identify [the Bureau's] goods and services and to distinguish them from the goods and services of others." *Appellant's Appendix* at 10. Thus, to the extent the trial court concluded that the mark had acquired secondary meaning, it is apparent that the trial court considered the time period *subsequent* to Serenity's first use. As described above, the proper question is whether the mark acquired secondary meaning *prior* to Serenity's first use.

In the present case, the Bureau presented no evidence that the mark at issue acquired secondary meaning before Serenity began using it. It is undisputed that Serenity purchased the domain name visitmichigancitylaporte.com on September 9, 2009 and immediately began using it to direct internet traffic to its main website on that date. The Bureau also claimed September 9, 2009 as the date of its first use of the mark in its application for trademark registration, and trial court found that the Bureau first used the mark in commerce on that

date. Assuming *arguendo* that the trial court's finding in this regard is supported by the evidence,[9] the Bureau's and Serenity's first uses of the mark were virtually simultaneous. Secondary meaning is acquired through actual use of a mark, and there is simply no evidence in the record supporting a conclusion that the mark became associated with the Bureau in the minds of consumers on September 9, 2009 in the hours prior to Serenity's registration of the domain name. Indeed, Jack Arnett, the Bureau's executive director, testified that the Bureau intended to *begin* using the mark following the September 9 announcement, and that securing the domain names would have been the first step in that effort. Because Serenity had already registered and begun using the visitmichigancitylaporte.com domain name by the time the Bureau sought to do the same, it would appear that Serenity began using the mark first, and it would therefore follow that the mark could not possibly have acquired a secondary association with the Bureau prior to Serenity's first use.

In arguing that it is nevertheless entitled to trademark protection, the Bureau argues that it made an investment in undertaking the branding study, registering the mark, and attempting to defend the mark by issuing cease-and-desist letters. The Bureau argues that trademark protection exists to protect such investments, and that Serenity made no comparable investment in or attempt to protect the mark, and has even denied ownership thereof.

---

[9] Serenity argues that the Bureau did not actually use the mark in commerce until well after September 9, 2009. According to Serenity, the Bureau merely announced an intention to use the mark on that date. We agree that merely announcing an intention to use a trademark is insufficient to confer trademark rights. 2 McCarthy § 16:11. Rather, trademark priority is granted to the party who first uses the mark in commerce. *Id.* Nevertheless, we need not sort out this particular dispute because we reach the same conclusion even if we accept the trial court's finding that the Bureau first used the mark on September 9, 2009.

As an initial matter, we note that Serenity's alleged denial of ownership of the mark would be entirely consistent with its argument that the mark is not protectable as a trademark. Additionally, we agree that trademarks exist, at least in part, to protect businesses' investments in marks as a means to inform consumers about the source of the goods or services they offer. *See Kohler Co. v. Moen, Inc.*, 12 F.3d 632; see also 1 McCarthy, § 2:2. This goal must be balanced, however, against competing concerns about depriving competitors of the ability to effectively market similar goods and services by removing descriptive terms from the public domain. *See Blau Plumbing v. S.O.S. Fix-It, Inc.*, 781 F.2d at 609 ("it is no purpose of trademark protection to allow a firm to prevent its competitors from informing consumers about the attributes of the competitors' brands"). The distinctiveness requirement is designed to strike a balance between these concerns by granting protection only when a mark is truly used to identify the source of goods or services, rather than to describe the goods or services themselves (or their geographical location). The Bureau's initial investment in and subsequent efforts to defend the mark are simply not relevant to whether the mark had acquired distinctiveness at the time of Serenity's first use.[10]

For all of these reasons, we conclude that the trial court's findings that the designation Visit Michigan City LaPorte was distinctive and properly registered as a trademark were clearly erroneous. Because the Bureau failed to establish that the designation was protectable as a trademark against Serenity, its claims of trademark infringement and cybersquatting

---

[10] These facts may be relevant, however, to the Bureau's remaining claim of common-law unfair competition, which is discussed further below. We also note that the trial court found that Serenity had made a number of misrepresentations to the trial court concerning its ownership of the domain name at a pretrial. Serenity's initial denial that it owned the domain name might also be relevant to the Bureau's remaining claims.

must necessarily fail.[11]  Accordingly, we reverse and remand with instructions to the trial court to vacate its judgment and enter judgment in Serenity's favor on these claims.

None of this is to say, however, that Serenity's actions are necessarily beyond the reach of the law.  Although the trial court ruled only on the Bureau's trademark infringement and cybersquatting claims, the Bureau asserted additional claims, including a claim of common-law unfair competition, which does not necessarily turn on the existence of a valid and protectable trademark.  *See also Keaton and Keaton v. Keaton*, 842 N.E.2d at 820 (noting that the law of unfair competition is very broad and not limited to passing off one's goods and services as those of another); *Felsher v. Univ. of Evansville*, 755 N.E.2d at 598 (noting that unfair competition does not refer to a tort with a specific number of elements, but "'instead describes a general category into which a number of new torts may be placed when recognized by the courts.  The category is open-ended, and nameless forms of unfair competition may be recognized at any time for the protection of commercial values'" (quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts*, 105 (5th ed. 1984)).  Because these claims were not addressed by the trial court, we do not pass on their merits.  Instead, we remand with instructions to the trial court to consider the Bureau's remaining claims.  Because this matter has already proceeded to a trial on the merits, however, the trial court may not receive new evidence and must limit its consideration to the evidence and claims already presented by the Bureau.

---

[11] Of course, this does not preclude the possibility that the mark could, in the future, become distinctive by acquiring secondary meaning.  In that event, the Bureau would be entitled to protection against unauthorized use by others, provided their use began subsequent to the mark's acquisition of secondary meaning.

2.

On cross-appeal, the Bureau requests an award of appellate attorney fees. Under Ind. App. Rule 66(E), "[t]he Court may assess damages if an appeal . . . is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees."[12] Our discretion to award attorney fees under App. R. 66(E) is limited to "instances when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). Because Serenity has prevailed on the merits of this appeal, an award of appellate attorney fees to the Bureau would be inappropriate.

Judgment reversed and remanded with instructions.

NAJAM, J., and BRADFORD, J., concur.

---

[12] In support of its request for appellate attorney fees, the Bureau cites the former Ind. Appellate Rule 15(G), which is no longer a part of the appellate rules. Requests for appellate attorney fees are now governed by App. R. 66(E).