**FOR PUBLICATION**



ATTORNEY FOR APPELLANTS:

**JONATHAN A. WATSON**
Passaro, Kahne & Taylor
Benton Harbor, Michigan

ATTORNEY FOR APPELLEE:

**MICHAEL S. BERGERSON**
Law Office of Michael S. Bergerson
Michigan City, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SERENITY SPRINGS, INC. and LAURA OSTERGREN, | ) | |
| | ) | |
| | ) | |
| Appellants-Defendants, | ) | |
| | ) | |
| vs. | ) | No. 46A04-1309-MI-470 |
| | ) | |
| THE LAPORTE COUNTY CONVENTION AND VISITORS BUREAU, by and through its Board of Managers, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAPORTE SUPERIOR COURT
The Honorable William J. Boklund, Judge
Cause No. 46D04-1101-MI-1

**July 16, 2014**

**OPINION – FOR PUBLICATION**

**MAY, Judge**

Serenity Springs appeals a judgment in favor of the LaPorte County Convention and Visitors Bureau ("the Bureau") that permanently enjoined Serenity Springs from using the internet domain name visitmichigancitylaporte.com and transferred the domain name to the Bureau. As "Visit Michigan City LaPorte" was not a protectable trade name and Serenity Springs' use of it was not unfair competition, we reverse.

## FACTS AND PROCEDURAL HISTORY

We set forth the facts underlying this appeal in *Serenity Springs v. LaPorte Cnty. Convention & Visitors Bureau*, 986 N.E.2d 314, 317-19 (Ind. Ct. App. 2013) (hereinafter "*Serenity Springs I*"):[1]

> The Bureau . . . is "the official destination marketing organization that represents the visitor industry and communities to create economic growth from visitor expenditures." The Bureau's goal is to increase tourism in LaPorte County, and in doing so, the Bureau promotes a number of hotels and attractions in the area. Serenity operates a hotel resort in LaPorte County, which is one of the businesses promoted by the Bureau.
>
> In early 2009, the Bureau contracted with a private marketing firm to conduct a branding study for the purposes of identifying new and better ways to promote tourism in the area. On September 9, 2009, the Bureau held a public meeting at which the results of the branding study were announced, and a representative of Serenity was in attendance. The Bureau's representatives announced that the phrase "Visit Michigan City LaPorte" had been identified as the branding identifier for the area.
>
> Immediately after the meeting, an employee of Serenity registered the domain name "visitmichigancitylaporte.com" at [the owner's] behest and set it up to redirect internet traffic to Serenity's website. Later that day, an employee of the Bureau attempted to register the same domain name, but discovered that it had already been purchased and was being used to direct internet traffic to Serenity's website. The Bureau was able to register a number of similar domain names, including visitmichigancitylaporte.org, visitmichigancitylaporte.net, and michigancitylaporte.com.

---

[1] We directed the trial court on remand to limit its consideration to evidence and claims the Bureau had already presented, and to receive no new evidence.

Thereafter, the Bureau sent a cease-and-desist letter to Serenity claiming that Serenity had infringed its trademark and committed cybersquatting by registering visitmichigancitylaporte.com. Serenity responded that it had been unable to find any federal or state trademark registrations for Visit Michigan City LaPorte and further claimed that (1) Serenity had not committed trademark infringement because it registered and began using the visitmichigancitylaporte.com domain name before the Bureau made any commercial use of the designation Visit Michigan City LaPorte, and (2) that the designation was not protectable as a trademark because it was merely descriptive and had not acquired distinctiveness.

On April 29, 2010, the Bureau filed an application with the Secretary of State to register "'Visit Michigan City LaPorte' and logo" as a trademark under the Indiana Trademark Act. In its application, the Bureau indicated that the mark was first used in commerce on September 9, 2009, and disclaimed any rights to the words "Michigan City" or "LaPorte." The Bureau received a certificate dated May 13, 2010 indicating that "Visit Michigan City LaPorte" had been registered as a trademark with the Secretary of State. The certificate also indicated that the mark was first used on September 9, 2009, and the words "Michigan City LaPorte" had been disclaimed.

On May 26, 2011, the Bureau sent another cease-and-desist letter to Serenity, again asserting that Serenity was infringing its rights in the now-registered trademark. The Bureau attached a copy of the certificate of trademark registration to the letter and informed Serenity that the letter would be its final attempt to resolve the matter before taking legal action.

Serenity sent a response letter to the Bureau on June 1, 2010. In the letter, Serenity again asserted that it was the first party to use the mark in commerce, and argued further that the Bureau's registration of the mark did not affect Serenity's common-law rights to use the mark or confer retroactive trademark rights. Serenity stated that it was willing to assign the domain name to the Bureau if it could provide proof that it first used the mark in commerce on or before September 9, 2009. Serenity argued that if the Bureau had not used the mark in commerce by that date, it had fraudulently misrepresented the date of first use on the application for trademark registration, which would result in cancellation of the registration.

On January 4, 2011, the Bureau filed a complaint against Serenity alleging trademark infringement, cybersquatting, and unfair competition. The Bureau also sought and obtained a preliminary injunction prohibiting Serenity from using the domain name. The matter proceeded to a bench trial on March 8, 2012, and the trial court entered judgment in favor of the Bureau on May 1, 2012. The trial court concluded that Serenity had

3

violated Indiana law by committing trademark infringement and "cybersquatting that approaches cyberpiracy[.]" The trial court permanently enjoined Serenity from using the Visit Michigan City LaPorte designation or the domain name visitmichigancitylaporte.com, and further ordered Serenity to transfer the domain name registration to the Bureau.

(Citations and footnote omitted.)

In *Serenity Springs I*, we determined the designation "Visit Michigan City LaPorte" was not subject to protection because it was merely descriptive of the geographic location of the goods and services the Bureau promotes, and it had not acquired a secondary meaning through actual use of the mark prior to Serenity Springs' first use. *Id*. at 325. As the Bureau had asserted additional claims, including common-law unfair competition, that the trial court had not yet addressed, we remanded. *Id*. at 327.

On remand, the trial court found Serenity Springs had committed seven common-law torts: common-law trade name infringement, a common-law tort based on Serenity Springs' intent to deceive, common-law acts amounting to cybersquatting, unfair competition in the form of conversion of intangible value, tortious interference with a contract or business relationship, tortious behavior in the nature of "palming off,"[2] and general unfair competition. It permanently enjoined Serenity Springs from using the

---

[2] The tort of "passing off" (also called "palming off") is a species of unfair competition that emerged in the nineteenth century as a type of fraud. *Keaton & Keaton v. Keaton*, 842 N.E.2d 816, 819 (Ind. 2006). Under this doctrine, liability is imposed for the intentional misrepresentation of goods or services as those of another. *Id*.

4

mark "Visit Michigan City LaPorte" or the domain name visitmichigancitylaporte.com. The case now before us is an appeal from the trial court's decision on remand.

## DISCUSSION AND DECISION

The trial court *sua sponte* entered findings of fact and conclusions of law. When the trial court enters such findings *sua sponte*, the specific findings control only as to the issues they cover, and a general judgment standard applies to any issue on which the court has not entered findings. *Scoleri v. Scoleri*, 766 N.E.2d 1211, 1214-15 (Ind. Ct. App. 2002). In reviewing the judgment, we determine whether the evidence supports the findings and the findings support the judgment. *Id.* at 1215. We will reverse only when the judgment is clearly erroneous, *i.e.*, when it is unsupported by the findings of fact and conclusions entered on the findings. *Id.* For findings of fact to be clearly erroneous, the record must lack probative evidence or reasonable inferences from the evidence to support them. *Id.* In determining the validity of the findings or judgment, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom, and we will not reweigh evidence or assess credibility of witnesses. *Id.* A general judgment may be affirmed on any theory supported by the evidence presented at trial. *Id.*

1.      Trade Name Infringement

The trial court first addressed "Tort in the Nature of Trade Name Infringement," (App. at 6), determining "the Bureau's brand is a trade name under which the Bureau conducts business" and the Bureau "made first use of the brand as a trade name and in so

5

doing gave it value." (*Id*. at 9.) As "Visit Michigan City LaPorte" is not a protectable trade name, there could have been no trade name infringement.

A trade name is "a word, name, symbol, device, or other designation, or a combination of such designations, that is distinctive of a person's business or other enterprise and that is used in a manner that identifies that business or enterprise and distinguishes it from the businesses or enterprises of others." *Keaton & Keaton v. Keaton*, 842 N.E.2d 816, 820 (Ind. 2006) (quoting Restatement (Third) of Unfair Competition § 12. We determined in *Serenity Springs I* that "Visit Michigan City LaPorte" was not "distinctive": "We have little difficulty accepting Serenity's argument that the designation is primarily geographically descriptive of the goods and services with which it has been associated. . . . Accordingly, the mark must have acquired secondary meaning in order to be protectable." 986 N.E.2d at 324.

We noted the Bureau presented no evidence that the mark at issue acquired secondary meaning before Serenity Springs began using it:

> It is undisputed that Serenity purchased the domain name visitmichigancitylaporte.com on September 9, 2009 and immediately began using it to direct internet traffic to its main website on that date. The Bureau also claimed September 9, 2009 as the date of its first use of the mark in its application for trademark registration, and trial court found that the Bureau first used the mark in commerce on that date. Assuming *arguendo* that the trial court's finding in this regard is supported by the evidence, the Bureau's and Serenity's first uses of the mark were virtually simultaneous. Secondary meaning is acquired through actual use of a mark, and there is simply no evidence in the record supporting a conclusion that the mark became associated with the Bureau in the minds of consumers on September 9, 2009 in the hours prior to Serenity's registration of the domain name.

*Id*. at 326.

We decline to revisit our holding "Visit Michigan City LaPorte" is not protectable, as the question whether the phrase is "distinctive" was expressly adjudicated in *Serenity Springs I. See*, *e.g.*, *Indianapolis Downs, LLC v. Herr*, 834 N.E.2d 699, 704 (Ind. Ct. App. 2005) (former adjudication is conclusive as to issues actually litigated and determined therein in a subsequent action even if the two actions are on different claims), *trans. denied*. As there was no protectable trade name, the trial court erred in determining there was a "tort in the nature of trade name infringement." (App. at 6.)

2.    Unfair Competition

The trial court found Serenity Springs had committed six more torts it explicitly characterized as variants of unfair competition:  a common-law tort based on Serenity Springs' intent to deceive, common-law acts amounting to cybersquatting, unfair competition in the form of conversion of intangible value, tortious interference with a contract or business relationship, tortious behavior in the nature of "palming off," and a "general unnamed tort of unfair competition." (*Id*. at 32.)  As the phrase "Visit Michigan City LaPorte," had not become identified with the Bureau before Serenity Springs began using it, it was error for the trial court to find Serenity Springs' use of the phrase was unfair competition.

In *Serenity Springs I*, we said this in addressing the Bureau's trademark infringement claims:

> This court has long held that the exclusive right to use a mark is acquired through adoption *and use* of the mark in commerce.  *See Johnson v.*

7

*Glassley,* 118 Ind. App. 704, 83 N.E.2d 488 (1949) ("[t]he mere adoption of a particular name as a trade name, *without actual use thereof in the market*, confers no right thereto, even though such adoption is publicly declared"); *Hartzler v. Goshen Churn Ladder Co.,* 55 Ind. App. 455, 104 N.E. 34 (1914).

986 N.E.2d at 340 (emphasis added.)

*Hartzler* was an unfair competition action. Goshen Churn Ladder Company manufactured and sold a stepladder under the name "Security Ladder." It alleged Hartzler

> conspired to create a corporation which should have a pretended color of right to use the name 'Security Ladder' for the purpose of deceiving the public into the belief that they were the original makers . . . of such ladders, and thus create, by means of the deception, an unfair and tricky competition in trade with [Goshen].

104 N.E. at 36.

There we noted:

> The question to be determined in every case is whether or not, as a matter of fact, the name or mark used by defendant *has previously come to indicate and designate* plaintiff's goods, or, to state it another way, whether defendant, as a matter of fact, is by his conduct passing off his goods as plaintiff's goods, or his business as plaintiff's business.
> * * * * *
> Even descriptive and generic names may not be used in such a manner as to pass off the goods or business of one man as and for that of another. Where such words or names *by long use have become identified in the minds of the public with the goods or business of a particular trader*, it is unfair competition for a subsequent trader to use them in connection with similar goods or business in such a manner as to deceive the public and pass off his goods or business for that of his rival.

104 N.E. at 38 (quoting 38 Cyc. 799-800) (emphasis added). As Serenity Springs bought and began using the domain name immediately after the Bureau announced it in a public

meeting, the name could not have "previously come to indicate and designate [the Bureau's] goods," nor could it have, by "long use," become identified in the minds of the public with the Bureau.

We acknowledge authority from other jurisdictions suggests a "single use" or an "initial use" is sufficient, *e.g.*, *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1265 (5th Cir. 1975) (use of trademark need not have gained wide public recognition and even a single use in trade may sustain trademark rights if followed by continuous commercial utilization). But even that standard is not met in the case before us; we have only the Bureau's statement of its *intention* to commence using that phrase.[3] Serenity Springs' actions therefore did not amount to unfair competition, and it was error for the trial court to so hold.

As "Visit Michigan City LaPorte," was not a protectable trade name and Serenity Springs' use of it was not unfair competition, we reverse.

Reversed.

VAIDIK, C. J., concurs.

RILEY, J., concurs in part and dissents in part.

---

[3] The dissent would find the Bureau "established a *bona fide* initial use of 'Visit Michigan City LaPorte'" by "allocating funds to contract with a marketing firm and announcing the results in a televised meeting." (Slip op. at 15.) We decline to hold paying for a study and announcing its results amounts to even a single or initial "use in trade."

# IN THE
# COURT OF APPEALS OF INDIANA

SERENITY SPRINGS, et al., )
)
    Appellants-Defendants, )
)
        vs. )    No. 46A04-1309-MI-470
)
THE LAPORTE COUNTY CONVENTION )
AND VISITORS BUREAU, )
)
    Appellee-Plaintiff. )

**RILEY, Judge, concurring in part and dissenting in part**

Although I agree with the majority's rather sparse analysis that 'Visit Michigan City LaPorte' is not a protectable trade name and therefore no trade name infringement can exist, I respectfully dissent from its treatment of the Bureau's common law unfair competition claim.

Unfair competition is generally defined as "the attempt to create confusion concerning the source of the unfair competitor's goods." *Rader v. Derby*, 89 N.E.2d 724 (Ind. Ct. App. 1950). A claim for unfair competition can be instituted by a party who has acquired a trade name right designation against a party who subsequently used an identical or similar phrase. *See Hartzler v. Goshen Churn Ladder Co*., 104 N.E.2d 34, 37 (Ind. 1914). But only a person who has applied a designation as a trademark first has priority in the use of the designation over another user. *See* Restatement (Third) § 19. In

the case at bar, both the Bureau and Serenity claim priority usage rights in 'Visit Michigan City LaPorte.'

In its discussion of the Bureau's claim based on unfair competition, the majority solely focuses on *Hartzler,* to reject a finding of unfair competition in Serenity's conduct of buying and using the domain name immediately after the Bureau announced it during a public meeting. *See* Slip. Op. pp. 8-9.

*Hartzler*, one of the first Indiana cases dealing with trademarks and trade names, was issued prior to the enactment of the federal and state trademark statutes. In this case, Goshen Churn & Ladder Co. (Goshen) brought an unfair competition claim against Hartzler, asserting that the name of Hartzler's corporation was "wrongfully and unlawfully selected in the imitation of [Goshen's] trade name 'Security Ladder' for the fraudulent purpose of deceiving the public and appropriating [Goshen's] good will and reputation." *Id.* at 36. Relying on "the general principles of the law of unfair competition as deduced from cases in other jurisdictions, and collected in textbooks," the *Hartzler* court noted, as alluded to by the majority, the general rule that

> A dealer *coming into a field already occupied* by a rival of established reputation must do nothing which will unnecessarily create or increase confusion between his goods or business and the good or business of his rival.

. . .

> Even descriptive and generic names may not be used in such a manner as to pass off the goods or business of one man as and for that of another. Where such words or names *by long use have become identified in the minds of the public with the goods or business of a particular trader*, it is unfair competition for a subsequent trader to use them in connection with similar

11

goods or business in such a manner as to deceive the public and pass off his goods or business for that of his rival.

*Id*. at 38 (emphasis added). Ultimately, *Hartzler* concludes its recitation of these principles by declaring "[t]he question in every case is whether the defendant is in fact attempting to sell his goods as the goods of someone else." Also, "[u]nfair competition is always a question of fact. The question to be determined in every case is whether or not, as a matter of fact, the name or mark used by defendant has previously come to indicate and designate plaintiff's goods, or, to state it another way, whether defendant, as a matter of fact, is by his conduct passing off his goods as plaintiff's foods, or his business as plaintiff's business." *Id*.

To this day, *Hartzler*, decided in 1914, is still good law. However, *Hartzler* dealt with advertisements and circulars. In the case at bar, we are called upon to evaluate domain names and internet registrations. In other words, *Hartzler's* principles and "long use requirement" were enunciated in a time when men drove a cart and horse and life proceeded more slowly but they are difficult to apply to an era where messages can be sent at the speed of light and goods can be purchased by the push of a button. Although it is "frequently feasible to pour new wine into old legal bottles," here, the old rule—albeit still valid—simply cannot keep up with the modern advances in technology. *See Felsher v. University of Evansville*, 755 N.E.2d 589, 599 (Ind. 2001).

Despite my state- and nationwide research, no single similar case exists—even Indiana case law in general is extremely sparse with respect to trademarks, let alone trade

12

names. Although factually some cases might come close, no court before us has dealt with the almost simultaneous registrations of domain names in the context of common law unfair competition.

In an effort to keep up with the modern advances in technology,[4] the Restatements and some out-of-state case law seem to move away from the rigid requirement to establish a "long use" in order to acquire priority of use in exchange for "[t]he *bona fide* nature of the use rather than its extent or frequency is determinative." *See* Restatement (Third) § 18. Therefore, the "initial use of a designation can be sufficient to constitute *bona fide* commercial use if the circumstances indicate an intention to continue the use in the ordinary course of business." *See* Restatement (Third) § 18; *See also La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc*., 495 F.2d 1265 (2d Cir. 1974) (The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially.); *Blue Bell, Inc. v. Farah Mfg.Co*., 508 F.2d 1260, 1265 (5ᵗʰ Cir. 1975) (Even a single use in trade may sustain trademark rights if followed by continuous commercial utilization.).

Within the context of trademarks, the Restatement (Third) § 18 notes as follows:

---

[4] Similar efforts have been made in the area of trademark law. Until 1988, the federal trademark statute made "actual use" a prerequisite to protection. However, the 1988 amendments to the Lanham Act recognized the acquisition of rights prior to the actual use if the person "has a *bona fide* intention [] to use a trademark in commerce." (Restatement (Third) §18). *See, e.g.*, 15 U.S.C.A. § 1057(c) which provides that the filing of an application for registration constitutes "constructive use" of the mark.

> In the case of goods, trademark claims based on a use of the mark in advertising are typically raised in an attempt to establish rights prior to the initiation of actual sales. The use of a designation in pre-sales solicitations, presentations, or other advertising can result in the creation of good will symbolized by the designation even before any actual sales. The case law, although not always denominating the user's interest in a trademark, frequently recognizes in such circumstances the user's right to protection against unfair competition resulting from a use of the designation by another. [] Such pre-sales activity can qualify as a trademark use if the use is calculated to produce the required association between the mark and the user's goods and is done in the user's ordinary course of business.

In light of this emerging move away from the rigid adherence to a "long established use" of the trademark or trade name, I would consider the Bureau's *bona fide* use of the domain name during the ordinary course of its business.

Although acknowledging this new trend in the case law, the majority rather nonchalantly declared in its opinion that "even that standard [of single use] is not met in the case before us; we have only the Bureau's statement of its *intention* to commence using that phrase." Slip op. p. 9. Rather than relying on the heavily sanitized version of the facts used by the majority but instead considering the actual record before me, I find that the evidence reflect otherwise. The Bureau presented that it contracted with a private marketing firm in early 2009 to conduct a branding study for the purposes of identifying new and better ways to promote tourism in the area. On the morning of September 9, 2009, the Bureau held a televised public meeting, pursuant to its compliance with the Open Door provisions, during which it announced the results of its branding study and introduced the public to 'Visit Michigan City LaPorte' as its unique identifier. Jack

14

Arnett, the Bureau's director, testified that a marketing campaign of the phrase would begin immediately after the public meeting by securing the domain name, changing letter head and visitors guides, and employ the services of the local radio stations and newsletters. In fact, the record reveals that business cards and visitor guides had already been prepared with the new designation in anticipation of the Bureau securing the rights to 'Visit Michigan City LaPorte.' It is furthermore undisputed that Serenity purchased the domain name 'visitmichigancitylaporte.com' immediately upon the Bureau's unveiling on September 9, 2009 and instantaneously began using it to direct internet traffic to its main website.

By following internal protocol in allocating funds to contract with a marketing firm and announcing the results in a televised meeting in compliance with the Open Door provisions, the Bureau established a *bona fide* initial use of 'Visit Michigan City LaPorte' during its ordinary course of business calculated to project to prospective tourists "the significance of the designation as an identifying symbol." Restatement (Third) § 18. A subsequently planned marketing campaign sufficiently marked the beginning of commercial exploitation of the identifying phrase. *See* Restatement (Third) § 18 (use of a designation in the various advertising media can now establish the designation's significance as an identifying symbol as surely as its appearance on packaging or labels). Only after the unveiling of the designation, but still during the on-going meeting, did Serenity purchase the rights of the corresponding domain name. Use of a designation merely to frustrate the marketing plans of another seller who is preparing to use a similar

15

mark is not a *bona fide* use in the ordinary course of business.  Restatement (Third) § 18. For these reasons, I conclude that priority of use in 'Visit Michigan City LaPorte' lies with the Bureau.

Moreover,

> [i]n order to make out a case of unfair competition, it is not necessary to show that any person has been actually deceived by the defendant's conduct and led to purchase his goods in the belief that they are the goods of plaintiff, or to deal with defendant thinking that he was dealing with the plaintiff. *It is sufficient to show that such deception will be the natural and probable result of defendant's acts*.  But either actual or probable confusion must be shown, for if there is not probability of deception, there is no unfair competition.

*Hartzler*, 104 N.E. at 37-38 (emphasis added).  While the parties did not present any evidence that visitors attempting to access the Bureau's website were *actually* deceived into visiting Serenity's website and purchasing a vacation package, Serenity's availment of this particular domain name nevertheless poses the risk of a "probability of confusion." *See id.*

By registering the domain name 'visitmichigancitylaporte.com' and linking it to its website, Serenity ensured that Web surfers searching for information about the diverse attractions and accommodations located in La Porte County and promoted by the Bureau were diverted to Serenity's own Web page instead.  Laura Ostergren, Serenity's proprietor, testified that the company developed a three-day guest package stay which was linked directly to the domain name and "which encouraged people [] to do [things] in the area."  (Appellant's App. p. 55).  The page also included a link to the Bureau's website as well as to Harbor Country, the neighboring county.

16

Based on the timing and circumstances of the acquisition of the domain name by Serenity, a reasonable inference can be made that Serenity's strategy was to divert internet traffic away from the Bureau's website, which contained links and recommendations to Serenity's competitors, by having potential vacationers view Serenity's accommodations first. To make the confusion even more outspoken, Serenity included links on its website to the natural attractions of the area and neighboring county, much like the ones found on the Bureau's website. Thus, instead of comparing and contrasting all available accommodations in La Porte County, Serenity's web site deceived the potential vacationer into purchasing its vacation from Serenity. By appropriating the Bureau's trade name and linking it to its own website, Serenity created this probable confusion and deception and consequently committed unfair competition with the Bureau. I would affirm the trial court's finding of unfair competition in favor of the Bureau.

In light of Indiana's sparse and outdated case law, I would urge our Legislature and supreme court, if the opportunity arises, to look beyond the man and cart method promoted by *Hartzler* and approved by an out-of-touch majority, and instead usher Indiana into the technological realities of the 21st Century by formulating tools appropriate to handle the complexities of the internet's realm.