In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 07-2136

AUTOZONE, INC. and AUTOZONE PARTS, INC.,

*Plaintiffs-Appellants,*

*v.*

MICHAEL STRICK, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 8152—**William T. Hart**, *Judge.*

_____

ARGUED APRIL 17, 2008—DECIDED SEPTEMBER 11, 2008

_____

Before RIPPLE, MANION, and TINDER, *Circuit Judges.*

MANION, *Circuit Judge.*  Plaintiffs AutoZone, Inc., and
AutoZone Parts, Inc. (collectively "AutoZone"), who
together comprise one of the largest retailers of automo-
tive parts in the United States, sued Michael Strick, Strick
Enterprises, Inc., and Strick, Inc. (collectively "Strick")
alleging that Strick's use of the trade names and service
marks "Oil Zone" and "Wash Zone" in his automotive
services businesses violated the Lanham Act, 15 U.S.C.

§ 1051 et seq., and Illinois statutory and common law. At the summary judgment stage, the district court held that AutoZone had failed to produce sufficient evidence to show a likelihood of confusion between AutoZone's and Strick's marks as a matter of law and dismissed AutoZone's suit. AutoZone appeals, and we reverse.

## I.

AutoZone operates approximately 3,500 stores nationwide. Its primary business is the sale of a wide variety of automotive products, though its stores also provide a few services in conjunction with the sale of those products, such as diagnostic advice, oil reclamation, and free battery testing. AutoZone stores do not have any service bays for car repairs, nor do they offer car washes or oil changes. They do, however, sell products related to washing cars and changing motor oil. AutoZone targets its products and services to two segments of the population: the general automotive-using public, and commercial automotive establishments that buy parts to make repairs for their customers. The vast bulk of AutoZone's business—90%—comes from the first category.

AutoZone operates under the federally registered trademark AutoZone with the design depicted below:



AutoZone refers to this mark as its "Speedbar Design."[1] In color, the series of stripes preceding the "AutoZone" name are depicted in orange, and the lettering is in red. AutoZone first began using the speedbar mark in November 1987 and has used it in Illinois since the early 1990's. By 1996, AutoZone had approximately 100 stores in the Chicago area operating under that mark.

AutoZone has extensively advertised the mark across the country since 1987. AutoZone's marketing in the Chicago area began to take off in the early 1990's. From 1994 to 2001, AutoZone paired national television advertising with sponsorships of local sports teams, such as the Chicago Bulls and the Chicago White Sox. In 1996, AutoZone labeled the Chicago area a growth market, spending a disproportionate share of its advertising funds there. Along with the sports sponsorships, AutoZone's Chicago-area advertising included television advertising on Chicago stations and national cable television, advertisements in magazines such as Sports Illustrated and Hot Rodder, weekly or biweekly ads in Chicago newspapers, local radio advertising, commercial sales calls to local automotive businesses near AutoZone locations, direct mail advertising, outdoor advertising on billboards and city buses, and ads in the yellow pages.

While AutoZone was established and advertising heavily in the Chicago market, Strick, who had been working in

---

[1] AutoZone also utilized the mark "Oilzone" internally in its stores. That mark was the subject of several counterclaims in the district court, but Strick voluntarily dismissed those claims and they are not at issue in this appeal.

the automotive goods and services industry, opened two businesses in the Chicago area, one in Wheaton[2] and the other in Naperville. Those stores provide automotive services such as car washes, 10-minute oil changes, transmission services, rear differential services, and coolant flushes. Strick's primary customer base is members of the general public that live within a one- to three-mile radius of one of Strick's two locations. Strick's businesses use the mark "Oil Zone," the appearance of which is depicted below:



A picture of Strick's Naperville Oil Zone location is below (along with two pictures in the record of an AutoZone store for comparison):



---

[2] Strick's Wheaton store is within one mile of an AutoZone store that opened in May 2000.

Strick also used the mark "Wash Zone" at his Naperville location, which provided car washes in addition to the other automotive services. That mark is very similar to Strick's Oil Zone mark, with the exception that when depicted in color, the letters of the Wash Zone mark are blue, as opposed to green for the Oil Zone mark. Strick began using the mark Oil Zone in July 1996, and the mark Wash Zone in 1998. At his deposition, Strick testified that he was completely unaware of AutoZone and its stores at the time he began using the Oil Zone mark. He also testified that the only step he took to determine whether he was legally entitled to use Oil Zone was to contact a search firm called "Lexis documents."

In December 1998, AutoZone became aware of Strick's businesses and directed Kirby & Associates, a private investigation firm, to investigate them. The investigators prepared their report on Strick's operations and submitted it to AutoZone the same month. AutoZone did not contact Strick about his use of the Oil Zone and Wash Zone marks until February 18, 2003, when it sent him a letter. It then filed this suit on November 14, 2003, alleging that Strick engaged in service mark and trademark infringement in violation of 15 U.S.C. § 1114(1), trade name infringement in violation of Illinois common law, unfair competition in violation of 15 U.S.C. § 1125(a) and Illinois common law, and service mark and trademark dilution in violation of 15 U.S.C. § 1125(c) and 765 ILCS 1036/65. AutoZone sought a permanent injunction enjoining Strick from using the Oil Zone and Wash Zone marks, as well as attorneys' fees and costs. After AutoZone amended its complaint, Strick filed an answer asserting a few counter-

claims and affirmative defenses, none of which is relevant to this appeal.

The parties then filed cross-motions for summary judgment. AutoZone sought partial summary judgment on some of Strick's counterclaims and affirmative defenses. Strick, on the other hand, moved for summary judgment on all of AutoZone's claims. Strick asserted that all of AutoZone's claims failed because the undisputed facts showed that there was no likelihood of confusion between the AutoZone mark and the Oil Zone and Wash Zone marks. Strick also maintained that it was entitled to summary judgment on the issue of laches because of AutoZone's four-year delay in filing suit.

The district court, in a comprehensive opinion, granted Strick's motion for summary judgment and denied AutoZone's motion.[3] The district court found that AutoZone's claims failed because the AutoZone mark and the Oil Zone and Wash Zone marks were "not similar enough for a reasonable finder of fact to find that there is a likelihood of confusion."[4] It did not reach the issue of laches. The district court entered final judgment on

---

[3] As was mentioned above, Strick later filed a motion to voluntarily dismiss his counterclaims with prejudice, which was granted.

[4] Although the district court noted that, under the amended version of 15 U.S.C. § 1125(c), AutoZone need not prove a likelihood of confusion to prevail on its federal dilution claim, the court found that AutoZone's dilution claim still failed because AutoZone made no attempt to show actual or likely dilution of its mark.

May 2, 2007. AutoZone appeals.

## II.

On appeal, AutoZone challenges the district court's ruling, at the summary judgment stage, that AutoZone's infringement and unfair competition claims failed as a matter of law. Specifically, AutoZone claims that to avoid summary judgment it presented sufficient evidence that Strick's use of the Oil Zone and Wash Zone marks is likely to cause confusion with the AutoZone mark.

### A. Summary Judgment Standard

We review de novo the district court's decision to grant summary judgment to Strick, viewing the facts in the light most favorable to AutoZone, the nonmovant. *Morton v. Motel 6 Operating L.P.*, __ F.3d __, No. 07-2417, slip op. at 8 (7th Cir. July 7, 2008). According to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[I]f there is any genuine material issue of fact, we must remand." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 615 (7th Cir. 1993).

### B. Likelihood of Confusion

A necessary element of AutoZone's infringement and unfair competition claims under both state and federal law

is that there be a likelihood of confusion between the AutoZone mark and the Oil Zone and Wash Zone marks. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001); *see also Stuart Hale Co.*, 1 F.3d at 615. We analyze seven factors to determine whether consumers are likely to be confused:

> (1) the similarity between the marks in appearance and suggestion;
>
> (2) the similarity of the products;
>
> (3) the area and manner of concurrent use;
>
> (4) the degree and care likely to be exercised by consumers;
>
> (5) the strength of the plaintiff's mark;
>
> (6) any actual confusion; and
>
> (7) the intent of the defendant to "palm off" his product as that of another.

*Packman v. Chicago Tribune Co.*, 267 F.3d 628, 642 (7th Cir. 2001). No single factor is dispositive. Courts may assign varying weight to each of the factors depending on the facts presented, though usually the similarity of the marks, the defendant's intent, and actual confusion are particularly important. *Id.*

Whether consumers are likely to be confused about the origin of a defendant's products or services is ultimately a question of fact. *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1167 (7th Cir. 1986); *see also Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000); *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 912

(7th Cir. 1996). That question of fact may be resolved on summary judgment only "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *Packman*, 267 F.3d at 637 (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996)); *see also Stuart Hale Co.*, 1 F.3d at 616 ("[A] motion for summary judgment in trademark infringement cases must be approached with great caution."). As we will demonstrate below in our analysis of the factors bearing on the issue of likelihood of confusion, this is not a case where the evidence is so one-sided that the issue of likelihood of confusion can be properly determined at the summary judgment stage.

### 1. Similarity of the marks.

To determine whether two marks are similar, we view the marks as a whole. *See Estate of Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545-546 (1920) ("The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail."); *see also Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir. 1985). We must compare the marks "in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) (quoting *Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 898 (7th Cir. 2001)); *see also Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997) (noting that "it is inappropriate to focus on minor stylistic differences to determine if confusion is likely" when the marks are not usually encountered together). "[T]he test is not whether the public

would confuse the *marks*, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976). The court should therefore "consider whether the customer would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product." *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228-29 (7th Cir. 1993). Viewed from that perspective, the marks in this case are similar enough that a reasonable finder of fact could find that a consumer would believe that the marks are connected to the same source.

Here, both parties' marks are comprised of two words. All marks have "Zone" as the second word. The words are in the same font. They are slanted in the same direction. The first letter of both words is larger than the other letters in all the marks. And all marks feature bar designs that suggest movement or speed. (The similarity in architectural design between Strick's Naperville Oil Zone and Wash Zone and the pictures of an AutoZone store in the record also did not escape our notice.)

There are dissimilarities between the marks too, of course: they are usually portrayed in different colors, the bar designs run in different directions, and the first words are different. But viewing the facts in the light most favorable to AutoZone, as we are required to do at this stage of the litigation, the prominent similarities between the marks may very well lead a consumer cruising down

the street to believe, after driving past both parties' busi-
nesses, that Oil Zone and Wash Zone represented
AutoZone's entry into the oil-change and car wash-services
market. *See, e.g.*, *James Burrough Ltd.*, 540 F.2d at 275 (noting
that marks "must be compared in the light of what occurs
in the marketplace, not in the courtroom"). Thus,
AutoZone has created a genuine factual dispute as to
the similarity of the marks.

In an effort to avoid that conclusion, Strick relies heavily
on the Sixth Circuit's decision in *AutoZone, Inc. v. Tandy
Corp.*, 373 F.3d 786 (6th Cir. 2004). In *Tandy Corp.*, the
trademark dispute centered around the marks AutoZone
and PowerZone, a mark used by Tandy Corp. in its Radio
Shack stores. The Sixth Circuit held that the PowerZone
mark was not likely to cause confusion with the AutoZone
mark and affirmed the district court's grant of summary
judgment in favor of Tandy Corp. In the course of pointing
out several dissimilarities between the physical appear-
ances of the marks, the Sixth Circuit remarked that "the
differences between the first syllables of POWERZONE
and AUTOZONE cannot be ignored, particularly given
the ubiquity of ZONE." *Id*. at 796. Based on that comment,
Strick argues that our analysis should hinge on the non-
shared portions of the marks—Auto, Oil, and Wash—
rather than the shared common term Zone.

Such an argument ignores the context of that comment
by the Sixth Circuit in *Tandy Corp*. Just a few paragraphs
before, the Sixth Circuit had noted it could not consider
only the non-shared terms of Auto and Power because
to do so would violate the "anti-dissection rule" that

requires marks to be viewed in their entirety. *Id*. at 795 (citing 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:41, at 23-123 (2003) (hereinafter "McCarthy")). The difference between the words Auto and Power, while mentioned in the court's analysis, was therefore not crucial to the Sixth Circuit's decision. Rather, what *did* factor prominently into the Sixth Circuit's decision was the visual dissimilarities between the marks *taken as a whole*—the different fonts and visual impressions—and the fact that the PowerZone mark was always in close proximity to the Radio Shack mark, a prominent mark in its own right. *See id*. at 796-97.

In contrast to *Tandy Corp.*, Strick's marks—viewed in their entirety—*are* visually similar to the AutoZone mark. There is also no well-known mark like Radio Shack accompanying Strick's Oil Zone and Wash Zone marks that would allow consumers to easily distinguish between those marks and the AutoZone mark. Thus, *Tandy Corp.* offers minimal support to Strick's argument urging us to focus on the words Auto, Wash, and Oil, instead of the overall impression created by the marks.

### 2. *The similarity of the products.*

Like the previous factor comparing the similarity of the marks, "[o]ur inquiry in comparing the two products is not whether they are interchangeable, but whether 'the parties' products are the kind the public might very well attribute to a single source (the plaintiff).'" *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 463 (7th Cir. 2000)

(quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1089 (7th Cir. 1988)); *see also McGraw-Edison Co.*, 787 F.2d at 1169. The rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be put out by a single producer. Thus, "[a] likelihood of confusion may exist even if the parties are not in direct competition, or their products and services are not identical." *CAE, Inc.*, 267 F.3d at 679 (internal citation omitted).

No consumer would mistake an AutoZone store, which mainly sells products, for a Wash Zone or an Oil Zone, which primarily provides services. But, viewed in light of the similarity of the marks, a reasonable consumer may very well be led to believe that Oil Zone and Wash Zone are AutoZone spinoffs. A retailer or manufacturer with a strong mark venturing into a related service industry would not be that surprising. And the automotive services provided by Strick's businesses are related to the automotive products sold at AutoZone stores. Indeed, there is even some direct overlap between AutoZone's products and the services provided by Strick's businesses: Strick provides car washes and oil changes while AutoZone sells car-wash and oil-change products. A reasonable consumer, taking into account the similarity of the marks, could therefore conclude from the relatedness of the goods and services provided by AutoZone, Oil Zone, and Wash Zone that the marks are all attributable to a single source. Thus, AutoZone has shown that a genuine dispute exists here as well. *Cf. CAE Inc.*, 267 F.3d at 680-81 (upholding district court's finding that "the diverse nature of CAE, Inc.'s businesses makes it likely that

consumers might reasonably expect CAE, Inc. to expand its business to offer the same products and services offered by Clean Air in the air pollution control business") (internal quotation marks omitted).

In an effort to avoid that conclusion, Strick again points to *Tandy Corp.* But just as before, *Tandy Corp.* is not very helpful to Strick here. In *Tandy Corp.*, the record showed that AutoZone and Radio Shack competed in almost entirely different markets—there was a less than one percent overlap between the automotive products sold at AutoZone stores and the electronics equipment retailed at Radio Shack stores. *Tandy Corp.*, 373 F.3d at 789. As the district judge in *Tandy Corp.* quipped, "What idiot who wants to buy an automobile part is going to go to a Radio Shack?" *Id*. at 798. In contrast, this is not a case where the markets in which the parties compete are almost entirely distinct. Rather, both parties here operate automotive-oriented businesses that target segments of the general automobile-using public. We therefore remain unpersuaded by Strick's repeated appeals to *Tandy Corp.*

### 3.  *Area and manner of concurrent use.*

"The third factor in the likelihood of confusion analysis assesses 'whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties.'" *CAE, Inc.*, 267 F.3d at 681 (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir.1990)). In this case, the evidence in the record shows

that both parties sell and promote their automotive goods and services in the Chicago area. In response to that evidence, Strick points out that AutoZone promotes its goods and services on a national scale, while in contrast his business is limited to a one- to three-mile radius around his Naperville and Wheaton locations. Strick does not cite any authority, however, for conditioning infringement on the scale of the parties' respective operations, and for good reason: that proposition is undoubtedly incorrect. Such a rule would run counter to the cases, cited above, holding that infringement occurs when consumers are confused over affiliation, and not merely when businesses are identical. Moreover, accepting what Strick advocates would allow local businesses a free ride off of the advertising efforts and goodwill of larger national businesses. But trademark law makes no exception for the localized infringer.

Strick also argues that the customer bases for AutoZone and his businesses are "completely different," but a trier of fact from the record before us could reasonably conclude otherwise. Both businesses court members of the general automobile-using public. Of course there may be subsets of that group that will only change their oil themselves, and thus can only be AutoZone customers, or will not be bothered with changing their oil, thus making them only potential Oil Zone customers. But the record before us does not rule out the reasonable inference that a substantial congruence exists between the potential customer base in Naperville and Wheaton for AutoZone and Strick's businesses. AutoZone has therefore created a genuine factual dispute for this factor as well.

**4.** *Degree of care exercised by consumers.*

Despite reaching the ultimate conclusion that there was no likelihood of confusion as a matter of law, the district court found that this factor supported a possibility of confusion. *AutoZone, Inc. v. Strick*, 466 F. Supp. 2d 1034, 1043 (N.D. Ill. 2006). We agree. In assessing whether this factor favors finding a likelihood of confusion, we stated in *CAE, Inc. v. Clean Air Engineering, Inc.* that "[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." 267 F.3d at 683. That statement in *CAE, Inc.* also applies in this case. AutoZone has presented evidence that many of the products it sells are inexpensive. Furthermore, as the district court noted, there is no evidence in the record that customers of Strick's businesses "are particularly sophisticated or deliberative." *AutoZone, Inc*, 466 F. Supp. 2d at 1042. Keeping in mind, therefore, the physical similarity of the marks and the danger of affiliation confusion (as discussed above), a reasonable trier of fact could also conclude from the evidence in the record that the degree-of-care factor favors AutoZone.

**5.** *Strength of the plaintiffs' mark.*

"The stronger the mark, the more likely it is that encroachment on it will produce confusion." 2 McCarthy § 11.73, at 11-169 to 170 (2008) (quoting *Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111 (6th Cir. 1996)). The strength of a mark usually corresponds to its economic and marketing strength. *Sullivan*, 385 F.3d at 777.

In this case, the evidence in the record is more than sufficient to support the conclusion that the AutoZone mark has plenty of economic and marketing strength. The AutoZone mark is displayed prominently on more than 3,000 stores nationwide, and it has been the subject of hundreds of millions of dollars' worth of advertising since 1987.

Despite the clear evidence of the economic and marketing strength of the AutoZone mark in the record, Strick nevertheless maintains that AutoZone's mark is weak. To support that assertion, Strick points to evidence that the word "Zone" is commonly found in other marks. That argument fails for two reasons. First, as the district court pointed out, Strick did not produce evidence to show how extensively any of the marks that use "zone" have been promoted or become recognized by consumers in the marketplace. *AutoZone, Inc.*, 466 F. Supp. 2d at 1042. Thus, that evidence does little to cast doubt on the strength of AutoZone's mark. *See CAE, Inc.*, 267 F.3d at 685 (noting that third-party trademark registrations can negatively impact the strength of a plaintiff's mark "only to the extent that the similar marks are promoted by their owners or recognized by the consuming public"). Second, Strick's focus on the term "Zone" misses the point. As we discussed above, "[t]he commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail." *Estate of Beckwith*, 252 U.S. at 545-546; *see also Tandy Corp.*, 373 F.3d at 795 ("Conflicting composite marks are to be compared by looking at them as a whole, rather than breaking the marks up into their component parts for comparison . . . .

The rationale for the rule is that the commercial impression of a composite trademark on an ordinary prospective buyer is created by the mark as a whole, not by its component parts." (quoting 3 McCarthy § 23:41, at 23-123 (2003))). "Zone" by itself might be generic and subject to little protection, but the same is not true of the composite mark AutoZone. A trier of fact could reasonably conclude that AutoZone's mark is strong, thus making confusion due to the similarity of Strick's marks more likely.

### 6.   *Intent to palm off.*

Strick testified at his deposition that he was not aware of the AutoZone mark when he created the Oil Zone mark. Strick points to that testimony and argues that the evidence is undisputed that he did not intend to mislead the public into believing that his goods and services were in some way related to AutoZone. That argument, however, fails to take into account all the evidence in the record bearing on Strick's knowledge of AutoZone's mark and his intent to create a mark confusingly similar to it. AutoZone presented evidence that the AutoZone mark was being extensively marketed in the Chicago area (where there were over 100 AutoZone stores) at the time that Strick chose to adopt the Oil Zone mark. The advertising AutoZone did was both national *and* local, so someone like Strick would have had a hard time missing it—especially since the record shows that Strick had been working in the same industry as AutoZone before he created Oil Zone.

In some circumstances, an intent to confuse may be reasonably inferred from the similarity of the marks where the senior mark has attained great notoriety. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992). If the marketing and business presence of the senior mark (in this case AutoZone) is nearly ubiquitous in the geographic area where the junior mark competes, a trier of fact can easily conclude that the creator of a strikingly similar junior mark intended to confuse. Here, a reasonable trier of fact could conclude from Strick's experience in the industry, AutoZone's extensive marketing of its mark in the area where Strick did business, and the close similarity in design between the marks that Strick designed the Oil Zone mark with the intent to mislead consumers into believing that Oil Zone was somehow affiliated with AutoZone. Whether Strick was telling the truth when he testified that he was not aware of the AutoZone mark when he created Oil Zone is for the trier of fact to decide. *See Stuart Hale Co.*, 1 F.3d at 619 ("[T]he district court cannot weigh credibility issues at the summary judgment stage.").

In sum, we conclude from our analysis of the relevant factors that a reasonable finder of fact could have found that consumers might be led to believe that AutoZone and Strick's Oil Zone and Wash Zone are affiliated with each other. AutoZone has therefore presented sufficient evidence to create a triable issue of fact on the issue of likelihood of confusion. After its careful and thorough examination, had the district court gone on to resolve the factual issues that we have recited, this case would be in a different posture on review. But

because there are unresolved genuine issues of material fact, summary judgment was not appropriate. Since this case will likely be tried to a judge rather than a jury, nothing in this opinion should be read to foreclose the new trier of fact from reaching the same ultimate conclusion—or an opposite holding—after the parties' presentation of the evidence at trial, provided that its decision is supported by sufficient factual findings. This opinion is not intended to project who should prevail at trial. Nevertheless, to ensure a fresh analysis, Circuit Rule 36 shall apply on remand.

That brings us to the last issue: the application of the doctrine of laches. In his brief, Strick asserts that the district court's judgment can still be affirmed, despite erring on the likelihood-of-confusion issue, on the ground that laches bars AutoZone's suit. Although briefed in Strick's summary judgment motion, the district court expressly declined to rule on that issue. Because a district court's decision to apply the doctrine of laches is discretionary, *see Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999), we leave it to the district court to determine, in the first instance, how it will exercise its discretion.

**III.**

Viewing the facts in the light most favorable to AutoZone, a reasonable trier of fact could find that consumers are likely to be confused between the AutoZone mark and the Oil Zone and Wash Zone marks. Accordingly, the judgment of the district court is REVERSED, and

the case is REMANDED for further proceedings consistent with this opinion.