

IN THE

# Court of Appeals of Indiana

Kimberly A. White,

*Appellant-Defendant/Counterclaim Plaintiff*

v.

Town of Plainfield, Indiana

*Appellee-Plaintiff/Counterclaim Defendant*



FILED

Aug 05 2025, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

August 5, 2025

Court of Appeals Case No.
24A-PL-1690

Appeal from the Hendricks Superior Court

The Honorable Mark A. Smith, Judge

Trial Court Cause No.
32D04-2312-PL-143

---

**Opinion by Judge Kenworthy**
Chief Judge Altice and Judge Felix concur.

**Kenworthy, Judge.**

## Case Summary

[1] This appeal stems from a dispute between Kimberly White and the Town of Plainfield ("Plainfield") over White's use of a red, stylized "P" (the "Mark") in a newsletter she creates. Once Plainfield—the longtime user of the Mark—learned White copied and used the Mark without permission, Plainfield registered the Mark and later sued. White counterclaimed, seeking the registration of the Mark be declared invalid under Indiana law. Plainfield won and obtained an injunction preventing White from continuing to use the Mark. White now appeals, raising several issues, which we consolidate and restate as:

> 1. Is the Mark unregistrable under Indiana law because it consists of or comprises a flag or "other insignia" of Plainfield?
>
> 2. Did the trial court clearly err in determining White infringed on Plainfield's Mark?

[2] We affirm.

# Facts and Procedural History[1]

## *A. Plainfield's use of the Mark*

Since at least October 2005, Plainfield has used the following Mark as a town logo:



*Ex. Vol. 3* at 7. Plainfield displays the Mark—sometimes accompanied by the italicized name of the town, sometimes not—on every page of its website, signs at the edges of town, wayfaring signs, landscaping features, and flags. Plainfield also uses the Mark to identify services it provides and to advertise nearby attractions. A few examples of Plainfield's uses are included below:

---

[1] We heard oral argument on June 24, 2025, at the JCC Indianapolis. We thank the JCC staff for the warm welcome, those in attendance for their attentiveness and thoughtful questions, and counsel for the quality of their advocacy.






*See id.* at 51–63 (depicting Plainfield's different uses of the Mark).

### B. White's use of the Mark

[4] White is a longtime resident of Plainfield. In early 2023, she began a newsletter titled "Thorough Information Disseminated by Investigative Townspeople," or "T.I.D.B.I.T." for short, to ease access to information about Plainfield's happenings. At first, White sent the newsletter via email to neighbors or other Plainfield residents who asked to receive it. By March 2023, the newsletter had grown in popularity, so White created a website to make the information more

readily available.  Located at www.plainfieldtidbit.com, White's T.I.D.B.I.T. website is purely informational; it does not advertise or sell any products or services.

[5]  To ensure visitors knew the information on the website concerned Plainfield, Indiana, and not some non-Hoosier town, White "went out to the Plainfield website and copied" the Mark.  *Tr. Vol. 2* at 34.  White then affixed the copied Mark onto the top of every page of her website.  Next to the copied image, White placed the T.I.D.B.I.T. logo she created—the words "PLAINFIELD T.I.D.B.I.T." in a stylized blue typeface.  What appeared on the T.I.D.B.I.T. website is shown below:



*Appellant's App. Vol. 2* at 25.

[6]  Around the same time, White also printed one thousand "business cards" containing the Mark alongside the T.I.D.B.I.T. logo.  *See Ex. Vol. 3* at 64.  Over time, White handed out nearly four hundred business cards to various individuals in Plainfield.  As White later explained, she searched federal and state trademark databases to check if Plainfield owned a registered trademark for the Mark.  Because her search revealed no such registered trademark, White

did not believe she was violating federal or state trademark law by including the Mark on her website or business cards.

### C. Plainfield learns of White's use, registers the Mark, and sues

[7] Plainfield first learned of White's use of the Mark when Plainfield's director of marketing and communication—Stephanie Singh—received a Google mailer relating to T.I.D.B.I.T.[2] White had listed the address of the Plainfield Government Center as T.I.D.B.I.T.'s address on her website. At times, Singh received questions about T.I.D.B.I.T. and on at least one occasion provided White with corrected information to include on her website. Still, White's use of the Mark was "concerning [to Singh] because it blur[red] the line for residents. They may not be sure if the Town of Plainfield is operating that website or not because . . . the logo is to represent our brand and if someone else is using it they may think the Town of Plainfield promotes that . . . information." *Tr. Vol. 2 at 57.*

[8] In Spring 2023, White's use of the Mark was discussed at a Plainfield Executive Leadership Team meeting. Following the meeting, the team decided to register the Mark and retained outside counsel to prevent White's unauthorized use of the Mark. Plainfield's registration applications described the design as a "Capital letter 'P' placed above the italicized word 'Plainfield.'" *Ex. Vol. 3 at*

---

[2] A Google mailer is a physical postcard sent by Google to the listed business address when someone creates a business on Google. The mailer includes a PIN number that is used to verify the business address. The goal of the mailer is to ensure the creator of the business has access to the listed address. *See Tr. Vol. 2 at 72.*

31, 39, 48 (capitalization normalized).[3]  The applications also included the following disclaimer: "Without waiving any right at common law, no claim is made to the exclusive right to use the word 'Plainfield' apart from the mark as shown."  *Id.* (capitalization normalized).  The Secretary of State approved Plainfield's applications on May 22, 2023.  Upon successfully registering the Mark, Plainfield sent White cease-and-desist letters in June and August.  White refused to remove the Mark from her website, so Plainfield sued.

### D. Plainfield's lawsuit against White

In its suit against White, Plainfield sought declaratory and preliminary and permanent injunctive relief, alleging White infringed on its Mark by displaying it on her T.I.D.B.I.T. website and business cards.  Plainfield did not seek damages.  White, appearing *pro se*, counterclaimed, arguing the Mark was invalid and subject to cancellation under Indiana law.

The trial court granted Plainfield a preliminary injunction and ordered White to refrain from infringing on Plainfield's trademark rights.  Sometime after, White added a pop-up disclaimer to her website, alerting visitors the website was not affiliated with the town of Plainfield.  *See Appellant's App. Vol. 2* at 57 (including illustration of the added pop-up).  The case went to bench trial, during which White represented herself.  In June 2024, the trial court entered judgment in

---

[3] Plainfield registered the Mark under three classes: advertising and business; transportation and storage; and education and entertainment.  *See id.* (including additional descriptions relating to class).  In total, Plainfield filed three applications, one for each class.

Plainfield's favor, permanently enjoining White from using Plainfield's registered Mark in any manner. White appealed, and the trial court stayed enforcement of its permanent injunction order pending resolution of this appeal.

## Standards of Review

[11] This case involves two standards of review: clear error and *de novo*. We review special findings and conclusions entered following a bench trial for clear error, applying a two-tiered standard of review: "first determining whether the evidence supports the findings and, if so, whether the findings support the judgment." *Town of Linden v. Birge*, 204 N.E.3d 229, 233 (Ind. 2023); Ind. Trial Rule 52(A). We do not reweigh evidence or reassess witness credibility. *See Town of Linden,* 204 N.E.3d at 234; T.R. 52(A). Because White appeals from an adverse judgment—one entered against a party defending on a given question—trial court findings are clearly erroneous "if they are not supported by substantial evidence of probative value." *Serenity Springs v. LaPorte Cnty. Convention & Visitors Bureau*, 986 N.E.2d 314, 319 (Ind. Ct. App. 2013) (explaining what constitutes clear error depends on whether the appellant is appealing a negative or adverse judgment). A finding or conclusion is clearly erroneous if it leaves us with a "firm conviction that a mistake has been made." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997).

We review the trial court's legal conclusions and any questions of law—like statutory interpretation—*de novo*. *Nardi v. King*, 253 N.E.3d 1098, 1103 (Ind. 2025).

## Trademark Law Background

Before exploring the substance of White's appeal, we start with a brief background on trademark law and some of its core principles. "Trademarks and their precursors have ancient origins, and trademarks were protected at common law and in equity at the time of the founding of our country." *Matal v. Tam*, 582 U.S. 218, 224 (2017). In 1946, Congress passed the Lanham Act—officially, the Trademark Act of 1946—which "largely codified" the common law and created the current federal trademark scheme. *Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003). Nowadays, the Lanham Act is "the core federal trademark statute." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 145 (2023).

The Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. A "service mark" is the same as a trademark, except that it relates to services as opposed to goods or products. *See id.* Although a trademark can do many things, "[t]he principle underlying trademark protection is that distinctive marks—words, names, symbols, and the

like—can help distinguish a particular artisan's goods from those of others."
*B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015). That is, a mark tells the public who is responsible for a product or service. *Jack Daniel's*, 599 U.S. at 146; *Carroll v. Lordy*, 431 N.E.2d 118, 123 (Ind. Ct. App. 1982) ("The purpose of a trademark is to identify the source of the product, not the product itself."). To help protect a mark, any mark owner may apply to the United States Patent and Trademark Office ("USPTO") to get its mark placed on the federal register. *See Jack Daniel's*, 599 U.S. at 146. The Lanham Act also creates a federal cause of action for trademark infringement, which typically involves the owner of a mark suing someone using a mark that closely resembles its own. 15 U.S.C. §§ 1114(1)(A), 1125(a)(1)(A).

[15] The Indiana Trademark Act ("ITA") (Indiana Code Chapter 24-2-1) is "similar, and in some respects identical, to the Lanham Act." *Serenity Springs*, 986 N.E.2d at 323. "Although Indiana's body of trademark law is relatively undeveloped," *id.*, the ITA "is intended to provide a system of state trademark registration and protection that is consistent with the federal system of trademark registration and protection under the Trademark Act of 1946," I.C. § 24-2-1-0.5 (2006). As a result, our legislature has provided "[a] judicial or an administrative interpretation of a provision of the federal Trademark Act may be considered as persuasive authority in construing a provision of [the ITA.]" *Id.*

[16] The ITA's definitions of trademark and service mark almost mirror those of the Lanham Act. *See* I.C. §§ 24-2-1-2(8), (9). As with the Lanham Act, the ITA

allows a mark owner to register a trademark or service mark with the office of the Secretary of State. I.C. § 24-2-1-4 (2018). Upon receiving an application for registration, the Secretary of State may examine the application to ensure the mark is registrable and the application conforms with the ITA's requirements. *See* I.C. § 24-2-1-4.5 (2018). Registration provides a registrant with a remedy under the ITA for the infringement of the registered mark. *See* I.C. §§ 24-2-1-13 (providing cause of action), -14 (remedies for infringement); *see also Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 599 (Ind. 2001) ("Registration of the trademark with the office of the Secretary of State provides the registrant a remedy against the infringement of the registered trademark."). The ITA also permits an action to be brought to cancel a registered mark. *See* I.C. § 24-2-1-14.5 (2006). If a court of competent jurisdiction finds a registration was granted improperly, the Secretary of State shall cancel the registration. I.C. § 24-2-1-10(3)(C) (2021).

[17]     With this background in mind, we turn to the merits of White's appeal. First, we address White's claim that the Mark consists of or comprises the flag or "other insignia" of Plainfield and is therefore unregistrable under the ITA. After concluding the Mark is not unregistrable for such reasons, we address White's challenge to the trial court's order finding she infringed on Plainfield's Mark. Unable to say that order was clearly erroneous, we ultimately affirm.

## The Mark does not consist of or comprise the flag or "other insignia" of Plainfield.

[18] The ITA specifically bars certain marks from registration, like one that "consists of or comprises the flag, coat of arms, or other insignia of . . . a . . . municipality."[4]  I.C. § 24-2-1-3(3)(B).[5]  By imposing an absolute prohibition on registration of a mark that contains such items, this section "reflects the sentiment that such symbols are indicia of government authority that ought to be reserved for signifying the government." *In re Cnty. of Orange*, 2022 WL 3137036, at *3 (T.T.A.B. Aug. 4, 2022).[6]

[19] Determining whether the Mark falls within this exception to registrability involves interpreting Section 24-2-1-3(3)(B).  Our ultimate goal when interpreting a statute is to give effect to the legislature's intent.  *Nardi*, 253 N.E.3d at 1104.  We do this by giving a statute's words their "plain meaning and consider[ing] the structure of the statute as a whole." *Id.* (quoting *ESPN,*

---

[4] Although a copy of Plainfield's seal/coat of arms is not part of the appellate record, White does not allege the Mark is Plainfield's seal or coat or arms. *See In re City of Houston*, 731 F.3d 1326, 1328 (Fed. Cir. 2013) (holding a city may not register its own seal as a trademark), *cert. denied*.

[5] Section 2(b) of the Lanham Act prohibits the registration of a mark that "[c]onsists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof." 15 U.S.C. § 1052(b) (codifying Section 2(b)).  White focuses her argument on Section 24-2-1-3(3)(B) of the ITA, but, as our legislature has provided, we look to interpretations of Section 2(b) to help decide this issue under the ITA.

[6] The Trademark Trial and Appeal Board (the "Appeal Board") is "an administrative tribunal of the USPTO empowered to determine the right of a party to register its proposed mark." *Id.* at *5 (recognizing registration is the only issue within the Appeal Board's jurisdiction).  The USPTO also creates the Trademark Manual of Examining Procedure (the "Trademark Manual").  The Trademark Manual "does not have the force of law," but it does, however, "set[] forth the guidelines and procedures followed by the examining attorneys at the [USPTO.]" *In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 1366 (Fed. Cir. 1999) (internal quotation omitted).

*Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016)). "When those words are clear and unambiguous, we simply apply their plain meaning, without resorting to other canons of statutory construction." *Calvary Temple Church of Evansville, Inc. v. Kirsch*, 251 N.E.3d 1056, 1059 (Ind. 2025) (quoting *Ind. Right to Life Victory Fund v. Morales*, 217 N.E.3d 517, 524 (Ind. 2023)). We read the statutory language "logically and consistently with the statute's underlying policy and goals." *Nardi*, 253 N.E.3d at 1104 (quoting *Culver Cmty. Tchrs. Ass'n v. Ind. Educ. Emp. Rels. Bd.*, 174 N.E.3d 601, 604–05 (Ind. 2021)).

### A. The Mark does not consist of or comprise a "flag."

[20] We start with whether the Mark consists of or comprises a flag.[7] A photograph of Plainfield's flag is included below:



---

[7] As used here, the word "comprises" means "includes." *See In re Fox*, 702 F.3d 633, 638 (Fed. Cir. 2012).

*Ex. Vol. 3* at 56. Refusal to register under Section 24-2-1-3(3)(B) is appropriate "if the design would be perceived by the public as a flag, regardless of whether other matter appears with or on the flag." *In re Ala. Tourism Dep't*, 2020 WL 2301221, at *2 (T.T.A.B. May 6, 2020) (quoting *In re Fam. Emergency Room LLC*, 2017 WL 1345063, at *2 (T.T.A.B. Mar. 14, 2017)); Trademark Manual of Examining Procedure § 1204.01(a) (26th ed. 2024).

[21]     Plainfield's *flag* consists of or comprises the Mark; but that is not what Section 24-2-1-3(3)(B) prohibits. Rather, the Section targets *marks* that consist of or include a municipality's flag. This distinction was illustrated at trial. *See Tr. Vol. 2* at 75 (Plainfield Town Council president identifying "the town logo P" when shown a picture of the Plainfield flag). Under White's reading, Section 24-2-1-3(3)(B) would bar a municipality from registering an otherwise registrable mark merely because it is featured on the municipality's flag. But the Section does not sweep so broadly. The Mark does not consist of or comprise Plainfield's flag and is not excluded from registrability under Section 24-2-1-3(3)(B).

### B. The Mark does not consist of or comprise "other insignia."

[22]     White also posits the Mark is unregistrable because it constitutes "other insignia" of Plainfield. Because flags and coats of arms are "specific designs formally adopted to serve as emblems of governmental authority[,]" the term "'other insignia' should not be interpreted broadly, but should be considered to include only those emblems and devices that also represent governmental authority and that are of the same general class and character of flags and coats

of arms." *City of New York v. Blue Rage, Inc.*, 435 F.Supp.3d 472, 487 (E.D.N.Y. 2020) (quoting TMEP § 1204.02(a)); *see Shields of Strength v. United States Dep't of Def.*, 735 F.Supp.3d 755, 780–81 (E.D. Tex. 2024) (interpreting Section 2(b)'s "other insignia" prohibition to include marks or symbols identifying a person or group of people with some official, governmental authority or power). Formal adoption, however, is not required for a mark to be barred from registration as insignia. *Cnty. of Orange*, 2022 WL 3137036, at *5. Neither the relevant provision of the ITA nor that of the Lanham Act distinguishes between "official" and "unofficial" insignia. But "other insignia" "must be restricted in its application to insignia of the same general class" as the restrictions preceding it, that is, a flag or coat of arms. *In re United States Dep't of the Interior*, 1964 WL 8039, at *2 (T.T.A.B. Sept. 10, 1964); *see Fischer v. United States*, 603 U.S. 480, 487 (2024) (explaining the canon of *ejusdem generis* instructs "a general or collective term at the end of a list of specific terms is typically controlled and defined by reference to the specific classes . . . that precede it") (internal quotations omitted). Insignia "which are merely used to ide[nt]ify a service or facility of the Government are not insignia of" governmental authority. *Dep't of the Interior*, 1964 WL 8039, at *2.

[23] Plainfield uses the Mark to identify the services it provides and advertise nearby attractions. *See Ex. Vol. 3* at 31, 39, 48 (including advertising and business, transportation and storage, and education and entertainment as the classes of registration on Plainfield's registration applications). To do so, Plainfield displays the Mark throughout town (on flags, signs, landscaping features) and

on its website. Sure, Plainfield residents—and other consumers of Plainfield's services—associate the Mark with Plainfield. It is a trademark after all. Yet the Mark lacks connotation with government *authority* that Section 24-2-1-3(3)(B) seeks to exclude from trademark protection. *Cf. Cnty. of Orange*, 2022 WL 3137036, at *4–5 (holding the "prominent and repeated display" of a mark on a county's website and signage of government offices—including courthouses, hall of records, sheriff's office, board of supervisors meeting room, civic center, jail, coroner's office, law library, district attorney's office—"signif[ied] broad County of Orange authority, records, functions and facilities" and "would reasonably lead members of the general public to perceive the proposed mark as an 'insignia'" of the county). Without such a tie to governmental authority, the Mark falls outside the prohibition relating to "other insignia."[8] *See Dep't of the Interior*, 1964 WL 8039, at *2 (holding the mark of the National Park Service was not insignia of national authority and could be registered).

[24] Because the Mark neither consists of nor comprises the flag or "other insignia" of Plainfield, it is not unregistrable under Indiana Code Section 24-2-1-3(3)(B).

---

[8] Our conclusion is premised on the record before us. Had White supplemented the record with evidence that Plainfield uses the Mark in ways more like the county in *County of Orange*, our decision may have come out the other way. But as the counterclaim plaintiff, it was White's burden to show the Mark is subject to cancellation under the ITA. Because White has not compiled a record sufficient to carry that burden, her counterclaim fails.

## The trial court did not clearly err in determining White infringed on Plainfield's Mark.

White contends Plainfield failed to prove its infringement claim, even if the town holds a lawfully registered mark. Under the relevant provision of the ITA:

> [A] person who . . . uses, without the consent of the registrant, a reproduction, counterfeit, copy, or colorable imitation of a mark registered under [the ITA] . . . on or in connection with which the use is likely to cause confusion or mistake, or result in deception regarding the source of origin of the goods or services . . . is liable in a civil action brought by the registrant[.]

I.C. § 24-2-1-13(1)(B). For Plainfield to prevail on its claim of trademark infringement, it must prove two elements: (1) a valid, protectable interest in the Mark; and (2) White's use of the Mark is likely to cause consumer confusion. *See Serenity Springs*, 986 N.E.2d at 321.

### A. Validity

White claims Plainfield failed to present evidence its Mark is valid. "An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). A mark is inherently distinctive if its "intrinsic nature serves to identify a particular source of a product" or service. *Id.* at 768. Whether a mark is distinctive is a question of fact. *See Serenity Springs*, 986 N.E.2d at 322.

At this juncture, one difference between the ITA and the Lanham Act is particularly relevant. Under the ITA, a certificate of registration issued by the Secretary of State "is admissible in evidence as competent and sufficient proof of the registration of the mark in an action or judicial proceeding in a court of Indiana." I.C. § 24-2-1-5. In other words, a certificate of registration "is proof of registration only"; it is not "a substitute for evidence of the mark's validity." *Serenity Springs*, 986 N.E.2d at 324–25. So, registration is a prerequisite to sue for infringement under the ITA, but, unlike under the Lanham Act, it is not prima facie evidence of validity. *Compare id.* at 325, *with Iancu v. Brunetti*, 588 U.S. 388, 391 (2019) (noting registration constitutes prima facie evidence of validity). Thus, to support its infringement claim, Plainfield had to present additional evidence to establish the validity of the Mark. *See Keaton and Keaton v. Keaton*, 842 N.E.2d 816, 821 (Ind. 2006).

Although "common basic shapes or letters are, as a matter of law, not inherently distinctive," stylized shapes or letters whose design is "unique or unusual in the relevant market" can be. *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 382 (2d Cir. 2005) (internal quotation omitted), *cert. denied*. The law affords trademark protection to sufficiently stylized letters because doing so does not hamper effective competition; "competitors remain free to use nonstylized forms or their own alternative stylizations of the same . . . letter to communicate information about their products" or services. *Id.*

Here, Plainfield's Mark is inherently distinctive because it is sufficiently stylized and unique as to set it apart from an ordinary letter "P." Based on the Mark's

stylization, uniqueness, and use, viewers of the Mark associate it with Plainfield. *See, e.g.*, *Tr. Vol. 2* at 57 (Singh explaining the Mark represents Plainfield's "brand"); *id.* at 75 (Plainfield Town Council President recognizing the Mark as "the town logo P"). To be sure, White copied the Mark and placed it on her website for that exact reason—so website visitors knew she was discussing the Indiana town. Plainfield presented sufficient evidence the Mark is distinctive and capable of trademark protection. *See Star Indus.*, 412 F.3d at 383 (holding a vodka producer's stylized "O" with respect to shading, border, and thickness was sufficiently stylized to be inherently distinctive and protectable as a trademark).

## B. Likelihood of Confusion

Now, the "keystone" of trademark infringement—likelihood of confusion.[9] *Jack Daniel's*, 599 U.S. at 147 (quoting 4 J. McCarthy, Trademarks and Unfair Competition § 23:1 (5th ed. 2023)). Trademark law most commonly targets

---

[9] On appeal, White urges us to adopt and apply the so-called "*Rogers* test," which "offers an escape from the likelihood-of-confusion inquiry and a shortcut to dismissal." *Jack Daniel's*, 599 U.S. at 157; *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) (developing a threshold infringement test based on First Amendment values). But White did not mention *Rogers* in the proceedings below. True, White made passing references to the First Amendment in some filings and while representing herself at the preliminary injunction hearing and bench trial. Still, White's First Amendment arguments did not present a pattern of reasoning that would potentially implicate *Rogers*. That is, when White mentioned the First Amendment, she made no claim her use of the Mark had some expressive or artistic element and posed a slight risk of source confusion—*i.e.*, the type of use *Rogers* is meant to protect. *See Jack Daniel's*, 599 U.S. at 156 (explaining *Rogers* "kicks in when a suit involves solely 'nontrademark uses of [a] mark—that is, where the trademark is not being used to indicate the source or origin' of a product, but only to convey a different kind of message"). All this to say, White waived her argument that we should adopt and apply the *Rogers* test by not adequately raising it below. *See, e.g., B.N. v. Health & Hosp. Corp.*, 199 N.E.3d 360, 363 n.1 (Ind. 2022) (noting claims, including constitutional ones, not presented to the trial court are generally waived on appeal).

confusion "about the source of a product or service." *Moseley*, 537 U.S. at 428; *see also Jack Daniel's*, 599 U.S. at 147 (classifying source confusion as the "bête noire of trademark law"). Accordingly, we ask whether consumers who might use either product or service would likely attribute them to a single source. *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 425 (7th Cir. 2019). Whether the alleged infringer's use of a mark is likely to cause confusion is a question of fact left to the factfinder to decide. *Id.*; *see also Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429 (7th Cir. 1985) (Easterbrook, J.) ("It would be little short of arrogation for an appellate court to claim that just because every judge can bring to bear [their] own view of what is similar and what is not, the appellate judges' view must be the right one."), *cert. denied*. The plaintiff bears the burden of proving likelihood of confusion. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121 (2004).

[31] The Seventh Circuit looks to seven factors to determine whether there is a likelihood of confusion: (1) the similarity between the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care consumers are likely to use; (5) the strength of plaintiff's mark; (6) actual consumer confusion; and (7) the defendant's intent to "palm off" its product as that of another. *Uncommon,* 926 F.3d at 425. No single factor is dispositive, but "the similarity of the marks, the defendant's intent, and actual confusion" are usually most important. *Id.* (quoting *Packman v. Chicago Tribune*, 267 F.3d 628, 643 (7th Cir. 2001)). These factors are "useful insofar as they operate as a checklist to ensure that we do not overlook relevant evidence, but they are a

means to an end, not an end in themselves." *Bd. of Regents of Univ. of Wisconsin Sys. v. Phoenix Intern. Software, Inc.*, 653 F.3d 448, 454 (7th Cir. 2011). "Common sense is inherent in the factors." *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 934 (8th Cir. 2021), *cert. denied*.

### 1. Similarity Between the Marks

Viewing the marks as a whole, the court should consider "whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 930 (7th Cir. 2008) (internal citation and quotation omitted); *Uncommon*, 926 F.3d at 425–26 (explaining "marks are troublingly similar if a consumer viewing one party's mark would likely associate the product with the other party's product"). Because White copied the Mark, the marks are identical apart from a red box and T.I.D.B.I.T. logo White added next to the Mark. A reasonable fact finder could find a consumer would believe the marks are connected to the same source. *See CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 678 (7th Cir. 2001) (concluding marks that were "indistinguishable" and "virtually identical" weighed in favor of finding a likelihood of confusion).[10]

---

[10] In evaluating the similarity of the marks, White argues we should consider the fact her website now features a pop-up disclaiming any affiliation with Plainfield. In certain circumstances, adding a disclaimer may be an adequate remedy to assuage confusion. *See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1093 (7th Cir. 1988). But it is just that: a remedy. By enjoining White from continuing to use the Mark, the trial court implicitly concluded adding a disclaimer was inadequate.

## 2. Similarity of the Products or Services

[33] The next factor looks to the similarity of the products or services bearing the mark, focusing on "whether the products are the kind the public might very well attribute to a single source." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 728–29 (7th Cir. 2015), *cert. denied*. A likelihood of confusion can exist even when the products or services are not identical. *McGraw-Edison Co. v. Walt Disney Prod.*, 787 F.2d 1163, 1169 (7th Cir. 1986). Products or services are closely related, and thus more likely to cause a likelihood of confusion, when those products "would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992) (quotation and citation omitted), *cert. denied*.

[34] At the outset, we recognize Plainfield's use of the Mark is more varied than White's. Still, White's use overlaps significantly with Plainfield's. Plainfield and White both affix the Mark on the top left corner of every page of their websites. And on each of their respective websites, Plainfield and White share information relating to Plainfield's happenings. *See, e.g., Ex. Vol. 3* at 35 (screenshot of the "Business" page of Plainfield's website including information on Plainfield's current and past development projects); *Tr. Vol. 2* at 25 (White testifying she publishes information that has been collected about Plainfield). No doubt, White's website includes her own commentary. Even so, White's use was so like Plainfield's that a Plainfield resident asked whether they were "connect[ed]." *Tr. Vol. 2* at 71. White's use of the Mark need not be identical

to Plainfield's for a reasonable fact finder to conclude her use was likely to cause confusion. *See Int'l Kennel Club*, 846 F.2d at 1089 (holding a likelihood of confusion existed when the products were not identical but were sufficiently related to create an inference in consumers' minds that the products came from the same source).

### 3. Area and Manner of Concurrent Use

[35] This factor directs courts to look at "whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures." *Sorensen*, 792 F.3d at 730. Here, both parties use their respective websites to disseminate information about Plainfield to the town's residents or other interested readers. *See Tr. Vol. 2* at 22 (White testifying Plainfield residents are her "target audience"). A reasonable fact finder could weigh this factor in favor of a likelihood of confusion.

### 4. Degree of Care Consumers are Likely to Use

[36] Consumers ordinarily exercise less care when discriminating among products and services that are widely accessible and inexpensive. *Uncommon*, 926 F.3d at 426. Both Plainfield's and White's websites are free and accessible through a routine internet search. That said, there is little other evidence in the record touching on this factor.

### 5. Strength of Plainfield's Mark

[37] The "strength" of a mark typically refers to its distinctiveness, meaning its propensity to identify the products or services as emanating from a particular

source. *Id*. "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone*, 543 F.3d at 933 (quotation and citation omitted). As discussed above, the Mark is inherently distinctive because it is sufficiently stylized and unique such that it identifies Plainfield's products and services. *See Tr. Vol. 2* at 57 (conveying the Mark "represent[s] [Plainfield's] brand"). Plus, Plainfield uses the Mark frequently, pasting it on numerous signs, fixtures, and website pages. Based on the Mark's identifying propensity, a reasonable finder of fact could weigh this factor in favor of finding a likelihood of confusion.

### 6. Actual Confusion

[38] If available, evidence of actual confusion is "entitled to substantial weight." *CAE,* 267 F.3d at 685. But "isolated instances of actual confusion may be disregarded as *de minimis*." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 852 (7th Cir. 2023), *cert. denied*. Plainfield points to the Google Mailer and Singh's testimony that she received questions from a resident about whether White's business cards had any "connection" with Plainfield as evidence of actual confusion. *Tr. Vol. 2* at 71. Even if this is evidence of actual confusion, it is *de minimis* and insufficient to demonstrate a likelihood of confusion. *See Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1060 (7th Cir. 1995) (concluding evidence that three consumers were confused did not demonstrate likelihood of confusion). The lack of actual confusion evidence, however, is not fatal to Plainfield's claim. *See Sorensen*, 792 F.3d at 731.

### 7. White's Intent

"Mere knowledge of someone else's mark is insufficient to show intent to pass off." *Id.* Rather, in the trademark context, "intent" refers to the intent to confuse customers, not merely the intent to use a mark that is already in use somewhere else. *See Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1363 (7th Cir. 1995), *cert. denied.* Although White's end goal may not have been for T.I.D.B.I.T. readers to believe Plainfield itself was affiliated with her website, White sought to use the distinctive nature of the Mark to enable a website visitor to more easily confirm the information was about the Indiana town. So, White may not have intended to cause confusion, but her actions could have led to that result.

Considering the whole picture, with the seven factors and common sense as guidance, we cannot say the trial court clearly erred in finding White infringed on Plainfield's Mark.

## Conclusion

The Mark does not consist of or comprise the flag or "other insignia" of Plainfield. It therefore falls outside of Indiana Code Section 24-2-1-3(3)(B)'s bar on registering such marks. The trial court's determination that White infringed

on Plainfield's trademark rights was not clearly erroneous.  The trial court therefore properly enjoined White from continuing to use the Mark.[11]

[42] Affirmed.

Altice, C.J., and Felix, J., concur.

ATTORNEYS FOR APPELLANT

Sean P. Burke
Jeffery Furminger
Mattingly, Burke, Cohen, & Biederman, LLP
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Melvin Randolph Daniel
Jeffrey W. Parker
Vivek R. Hadley
Taft, Stettinius, & Hollister, LLP
Indianapolis, Indiana

---

[11] At the very end of her brief, White injects a one-paragraph request, devoid of any citation to legal authority, seeking to recover appellate fees because "Plainfield's actions were intentionally directed at [her] to stifle her political discourse." *Appellant's Br.* at 61 (claiming Plainfield acted in "bad faith").  We wield the power to award appellate fees "with extreme restraint." *Hoagland Fam. Ltd. P'ship v. Town of Clear Lake*, 257 N.E.3d 830, 845 (Ind. Ct. App. 2025) (citation omitted).  Acting with such restraint, we deny White's request to recover appellate fees.